**UNITED STATES of America,**
**Plaintiff,**

v.

**Frank Russell McCOY, Defendant.**

**No. 1:07–CR–18 (WLS).**

United States District Court,
M.D. Georgia,
Albany Division.

Dec. 24, 2009.

James N. Crane, Albany, GA, Chantel L. Febus, Damon King, U.S. Department of Justice, Washington, DC, for Plaintiff.

Catherine Michelle Leek, Morad Fakhimi, Stephen R. Glassroth, Federal Defenders of the Middle District of Georgia, Macon, GA, for Defendant.

SANDS, District Judge.

Presently pending before the Court are Defendant's Motion for Extension of Time (Doc. 36); Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33); Defendant's Motion to Dismiss the Indictment on Multiple Grounds of Preclusion and Estoppel (Doc. 34); Defendant's Motion to Unseal Transcripts of Grand Jury Proceedings (Doc. 41); Defendant's Motion to Dismiss Indictment on Grounds of Government Misconduct Before the Grand Jury (Doc. 50); Defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 70); Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72); Government's Motion for Enlargement of Pages (Doc. 74); Defendant's Motion to Strike (Doc. 76); and Defendant's Motion for Continuance (Doc. 122).

For the following reasons, Defendant's Motion for Extension of Time (Doc. 36) is **DENIED as moot;** Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33) is **DENIED** and the Court will not grant leave for an interlocutory appeal of the issue; Defendant's Motion to Dismiss the Indictment on Multiple Grounds of Preclusion and Estoppel (Doc. 34) is **DENIED;** Defendant's Motion to Unseal Transcripts of Grand Jury Proceedings (Doc. 41) is **DENIED;** Defendant's Motion to Dismiss Indictment on Grounds of Government Misconduct Before the Grand Jury (Doc. 50) is **DENIED;** Defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 70) is **DENIED as moot;** Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72) is **DENIED;** Government's Motion for Enlargement of Pages (Doc. 74) is **GRANTED;** Defendant's Motion to Strike (Doc. 76) is **DENIED as moot;** and Defendant's Motion for Continuance (Doc. 122) is **DENIED.**

## *PROCEDURAL BACKGROUND*

The various motions were filed and fully briefed by Defendant and the Government mainly between August 22, 2008 and February 13, 2009. A hearing regarding Defendant's four (4) Motions to Dismiss and

other pending motions was held on February 27, 2009.[1] (Docs. 101, 111). After the Court granted several Motions to Continue Trial in the Interest of Justice (see Docs. 25, 99, 105), trial has been set for the Court's January 2010 Albany Term. (Doc. 119).

### FACTUAL SUMMARY

Defendant, a resident of Minnesota, is a fiction writer. As many authors tend to do, Defendant's body of work pertains to a particular range of subject matter. In Defendant's case, according to the Indictment against him, the preferred literary milieu is "obscene 'fantasy' stories describing in explicit and graphic detail the sexual abuse, rape, and murder of children." (Doc. 1 at 2). At all times relevant to the Indictment, Defendant's fiction was posted on the Internet.

After Defendant's writings came to the attention of federal authorities during the child pornography prosecution of a separate criminal defendant, federal agents from the Middle District of Georgia conducted an investigation into Defendant. (Doc. 37 at 1 to 2). In 2005 and 2006, an undercover agent engaged in email correspondence with Defendant in which Defendant provided links to websites on which his writings could be obtained. (Doc. 37 at 3 to 7). The agent activated the links and downloaded numerous stories attributed to Defendant from the websites into the Middle District of Georgia. (Doc. 37 at 7). One of the websites, www.youngstuff.com, was hosted in the Southern District of Texas; another website, ftp.asstr.org, was hosted in the Northern District of California. (Doc. 37 at 2, 7). All of the stories were allegedly written and posted by Defendant in the District of Minnesota. (Doc. 37 at 6).

On June 13, 2007, the Grand Jury in the Middle District of Georgia returned a one-count Indictment against Defendant charging a violation of 18 U.S.C. § 1462, Transportation of Obscene Matters. (Doc. 1). Expressly included in the charge is Defendant's aiding and abetting liability under 18 U.S.C. § 2. (Doc. 1 at 1 to 2). The Indictment alleges that Defendant "did knowingly use an interactive computer service for carriage in interstate and foreign commerce obscene matters, and [did] aid and abet persons known and unknown to the grand jury in the use [of] an interactive computer service for carriage in interstate and foreign commerce obscene matters." (Doc. 1 at 1). Providing alleged facts in support of the charge, the Indictment alleges that Defendant "used an interactive computer service to transmit to the Middle District of Georgia and elsewhere, links to three websites: www.young-stuff.com/frank, ftp.asstr.org/pub/Authors/Frank_McCoy/index.htm; and www.mrdoubleena.com/htm/frank/index.htm; ... from which web sites the obscene stories were downloaded into the Middle District of Georgia and elsewhere." (Doc. 1 at 1–2). In relevant part, 18 U.S.C. § 1462 provides that: "Whoever ... knowingly uses any ... interactive computer service ... for carriage in interstate or foreign commerce— (a) any obscene, lewd, lascivious, or filthy ... writing ... or other matter of indecent character; ...—Shall be fined under this title or imprisoned...." 18 U.S.C. § 1462.

On November 21, 2005, one-and-a-half years prior to the Indictment's issuance, Federal Magistrate Judge Franklin L. Noel of the District of Minnesota had issued an Amended Order in which he denied the Government's application for a

---

**1.** Contrary to the Government's assertion in a November 20, 2009 letter, the motions were not "briefed and argued over a year ago." (Doc. 114).

search warrant of Defendant's home there. (Doc. 34–2 at 5). In the Amended Order, Judge Noel stated that to issue the search warrant, "this Court, *applying contemporary Minnesota standards,* must conclude that the fictional stories described in the affidavit meet the *Miller* [*v. California* ] standard." (Doc. 34–2 at 4 (emphasis added)). Judge Noel described the *Miller* standard as: "a state could outlaw works that, applying contemporary community standards, depict or describe specific sexual conduct in a patently offensive way and which taken as a whole do not have serious literary, artistic, political, or scientific value." (*Id.*). Judge Noel concluded that:

> In light of the language used by the Supreme Court in *Ashcroft* [*v. Free Speech Coalition*], and in light of the evolution of community standards since the Court decided *Miller,* this Court is unprepared to conclude that the depraved fictional stories described in the affidavit submitted in support of the Search Warrant are obscene, within the meaning of *Miller v. California.* . . . The written works at issue in the instant search warrant application appear to be available only to those, like the investigators in this case, who expressly seek such content. . . . As the Court is unwilling to subscribe to the Government's effort to criminalize the written word, it is unable to conclude that there is probable cause to believe that evidence of any crime will be found on the computers the Homeland Security Agent seeks to search.

(Doc. 34–2 at 4 to 5).

The Government appealed Judge Noel's ruling. (Doc. 34–2 at 6 to 10). On December 2, 2005, Federal District Court Judge Ann D. Montgomery, also of the District of Minnesota, issued a Memorandum Opinion and Order denying the Government's appeal and adopting Judge Noel's Amended Order. (Doc. 34–2 at 11). Judge Montgomery stated that "the pivotal issue is whether the writings expected to be found at the premises described in the search warrant constitute obscene, lewd, lascivious, or filthy writings." (Doc. 34–2 at 13). But, Judge Montgomery said, "the Court is not prepared to hold that the writings are obscene under the definition of *Miller.*" (Doc. 34–2 at 14). Judge Montgomery gave four reasons for her ruling. First, "[w]hile many persons, including this Court, find the materials at issue depraved and disturbing, community standards have significantly evolved since *Miller.*" (*Id.*). Second, the stories "are not publically available on the internet; rather, the ICS agent specifically requested them in an email." (*Id.*). Third, "the writings themselves are replete with warnings that the material contained within could be considered objectionable." (*Id.*). Finally, based upon a reading of *Ashcroft,* "[g]iven the fictional nature of the writings . . . the warrant must be denied." (*Id.*). Judge Montgomery concluded, "In sum, the Court agrees with Judge Noel's declaration that he is not willing to participate in the criminalization of the written word, available only to those who specifically seek it out." (*Id.*).

In the hours prior to Judge Noel's initial Order denying the Government's search warrant application, Magistrate Judges in both the Northern District of Texas and the Middle District of Georgia had granted search warrants to the Government in relation to the investigation and prosecution of Defendant. (Doc. 51 at 18 n. 1).

Defendant alleges that the Government, while serving its role as prosecutor in the Grand Jury process, did not submit the Orders of Judge Noel and Judge Montgomery to the Grand Jury for its deliberation. (Doc. 50 at 3 n. 1 and accompanying text). The Government has not affirmed or denied Defendant's allegation. (*See* Doc. 58 at 8 (describing the facts regarding the Grand Jury); *see generally* Doc.

58). The transcripts of the Grand Jury's proceedings are sealed. (*Cf.* Doc. 41).

## DISCUSSION

### I. DEFENDANT'S MOTION FOR EXTENSION OF TIME (Doc. 36)

Defendant's Motion for Extension of Time (Doc. 36) requests an adjustment of the time periods set in the Court's Order of July 18, 2008 (Doc. 31) for the filing of a proposed briefing schedule. This issue was addressed by both Defendant and the Government in the motion hearing of February 27, 2009. (Doc. 111 at 102–43). The Court, however, notes that Defendant has successfully filed four (4) Motions to Dismiss since filing his Motion for Extension of Time (Doc. 36). (*See* Docs. 33, 34, 50, 72). Thus, Defendant's Motion for Extension of Time (Doc. 36) is **DENIED as moot.**

### II. DEFENDANT'S MOTION TO DISMISS THE INDICTMENT FOR IMPROPER VENUE (Doc. 33) AND ADDENDUM THERETO (Doc. 35)

Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33) argues that the Middle District of Georgia is an improper venue for the criminal trial of Defendant under the charges alleged in the Indictment. Furthermore, Defendant's Addendum to Motion to Dismiss for Improper Venue (Doc. 35) asserts that should the Court deny Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33) then Defendant should be permitted to raise the issue to the Eleventh Circuit on interlocutory appeal. For the following reasons, Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33) is **DENIED,** and the Court will not grant leave for an interlocutory appeal of the issue.

As an initial matter, the Court finds the Indictment to be valid on its face. The Indictment "contains the elements of the offense intended to be charged," it "sufficiently apprises the defendant of what he must be prepared to meet," and because it tracks the language of 18 U.S.C. § 1462, the Indictment is "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Russell v. United States,* 369 U.S. 749, 763, 765, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *see United States v. Bobo,* 344 F.3d 1076, 1083 (11th Cir.2003). Because the Indictment is valid on its face and Defendant has failed to show it to be otherwise invalid, the Court may continue to address the alleged jurisdictional deficiencies raised by Defendant.

■ In briefs and oral argument, Defendant repeatedly argues that the Indictment does not allow for criminal venue in this District because the Indictment does not assert that Defendant transported obscene matter into this District. "Instead," argues Defendant, "the indictment alleges only that the defendant told someone in this district where such material may be found—which is insufficient for the establishment of venue here; ... defendant's alleged *actus reus* did not occur in any part of this district." (Doc. 38 at 9). Further argues Defendant: "In short, the indictment fails to allege that [Defendant] disseminated anything that was obscene anywhere, let alone having disseminated it through or into this district." (Doc. 33 at 8). As the Court understands Defendant's argument, Defendant is asserting that because the face of the Indictment charges him with using a computer to transmit into this District links to three website addresses—www.young-stuff.com/frank, ftp.asstr.org/pub/Authors/Frank_McCoy/index.htm, and www.mrdoubleena.com/htm/frank/index.htm—rather than any ac-

tual allegedly obscene writing, venue in this District is improper even if the recipient of the message containing the links to three website addresses later visited those websites and transmitted the allegedly obscene material into this District. The Court emphasizes for the purposes of its ruling that the Indictment charges Defendant only with sending *links* to three website addresses to this District; Defendant is not charged with *directly* sending to this District any allegedly obscene writing. (*See* Doc. 1).

At oral argument, the Government repeatedly argued that the charged conduct "is the transportation of the links to an undercover agent in Georgia."[2] (Doc. 111 at 21). Under this approach, the Government and Defendant appear in accord regarding the nature and circumstances of the charged conduct. And if this were indeed the sole position on which the Government stood, then the Court would agree with Defendant that venue is improper in this District in this case. The Court would side with Defendant because the Court would find that the text of the links themselves (*e.g.*, "www.young-stuff. com/frank," "ftp.asstr.org/ pub/Authors/Frank_McCoy/index.htm," and "www.mrdoubleena.com/htm/frank/index. htm"), viewed in an email message separate and apart from the website content, is not obscene as a matter of law under the three-factor test established by the Supreme Court in *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Straining to find words in the text of the links that could even be arguably obscene, the Court finds that neither "young-stuff," "asstr," nor "mrdoubleena," viewed separately or together and by the most puritanical standards, "appeal[ ]

[solely] to the prurient interest" or "depict[ ] or describe[ ], in a patently offensive way, sexual conduct specifically defined by" Georgia law. *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

The Government, however, states an alternative and more-favorable position in its Response to Motion to Dismiss the Indictment for Improper Venue (Doc. 37). The Government's brief asserts that Defendant's allegedly illegal conduct was his causing the allegedly obscene writings to be transmitted via a computer to this District from Texas and California when the links for www.young-stuff.com and ftp. asstr.org that had been emailed by Defendant were activated by the recipient in this District. (Doc. 37 at 11). The Court understands the Government's argument to be that Defendant aided and abetted those servers in their interstate transportation of the allegedly obscene material to this District.

The Government argues, and the Court agrees, that this theory of criminal liability is supported by the Eleventh Circuit's unpublished opinion, *United States v. Hair*, 178 Fed.Appx. 879 (11th Cir.2006). In *Hair*, a case involving transmission of images of child pornography under a separate statute, the Eleventh Circuit found "ample evidence that the defendant aided and abetted Yahoo in actually transferring the images of child pornography." *Hair*, 178 Fed.Appx. at 885. The Eleventh Circuit based its finding on the Government's evidence "that the defendant had the intent to transmit images to the undercover agent, and [that] by setting up and using the Yahoo server and the 'briefcase' func-

---

**2.** *See also* Doc. 111 at 22 ("[I]t is the government's position that that is the act that violated 1462, the defendant's e-mail sending these three links to the undercover agent who is located in Georgia. That is the charged conduct.... [T]he transportation of those three links in interstate commerce to the agent who was located in Georgia—it is chargeable conduct and is conduct that can make one subject to a charge as a principal and as an aider and abettor under the statute.").

tion, Hair caused Yahoo—without the knowledge of the company—to violate § 2252A(a)(1)." *Id.* The evidence had shown that the *Hair* defendant had sent to the undercover agent "an email with 'links' to a Yahoo 'briefcase' containing child pornography." *Id.* at 882.

The facts in Defendant's case, as alleged by the Government and charged in the Indictment, are strikingly similar to those in *Hair*. The facts, if proven by the Government, indicate that Defendant, by emailing to this District the links to the websites, aided and abetted the servers for www.young-stuff.com and ftp.asstr.org in making interstate transmissions of the allegedly obscene writings to this District. In light of the Eleventh Circuit's reasoning in *Hair* and the similarity of the current facts to that opinion, the Court finds the Government's theory persuasive.

Building upon its theory of liability, the Government's brief argues under *United States v. Bagnell* that "the interstate shipment of [obscene] materials are continuing offenses that occur in every judicial district which the material touches." *United States v. Bagnell*, 679 F.2d 826, 830 (11th Cir.1982). *Bagnell* explains that 18 U.S.C. § 1462 is a statute covered by the venue provisions of 18 U.S.C. § 3237(a), "which declares that any offense 'involving ... TRANSPORTATION IN INTERSTATE commerce' is a continuing offense that may be prosecuted in any district in which the crime took place" including "the district in which the materials were received." *Id.* at 831; *see also Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 583, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) ("If a publisher chooses to send its material into a particular community, this Court's jurisprudence teaches that it is the publisher's responsibility to abide by that community's standards."). The Government's stance, therefore, is that by aiding and abetting in the continuing offense of transmitting alleged-

ly obscene writings, Defendant is subject to prosecution in this District, wherein the allegedly obscene writings were received.

Defendant attempts to counter in his written Reply to the Government's Response (Doc. 38) that the undercover agent who activated the links to the website addresses "is the only entity to whom 'transportation' could be attributed ... as it was his affirmative act of *going* to a web site and *downloading* the stories that constituted 'transportation.'" (Doc. 38 at 6 (emphasis Defendant's)). Defendant supports this position by arguing that while "the Texas and California based companies were in possession of computers on which the stories were located, neither of those companies has been alleged to have performed any act remotely resembling 'transportation.'" (*Id.*).

Defendant's position, however, does not seem technically correct, particularly in light of Hair and the Supreme Court's description of Internet operations in *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). For the purposes of this case, the Court understands the operations of the Internet to be that servers are the sources from which electronic information is transmitted to a user. *Cf. Hair*, 178 Fed.Appx. at 882 n. 3 ("The briefcase and its contents are actually 'located' on an internet server, which is controlled by the owner/operator of the website. In this case, Yahoo owned the server on which the briefcase was located."); *Hair* at 885 ("We conclude that there was ample evidence that the defendant aided and abetted Yahoo in actually transferring the images of child pornography."). The Supreme Court explains that:

> "[H]ost" computers [are] those that store information and relay communications.... Individuals can obtain access to the Internet from many different sources, generally hosts themselves or entities with a host affiliation.... Any-

one with access to the Internet may take advantage of a wide variety of communication and information retrieval methods.... The best known category of communication over the Internet is the World Wide Web, which allows users to search for and retrieve information stored in remote computers.... In concrete terms, the Web consists of a vast number of documents stored in different computers all over the world.

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 850–54, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). In less tech-savvy terms, a server or "host" is a necessary middleman that stores the creator's electronic content and transmits it to the recipient. Defendant's counterargument appears to discount this fact, apparently asserting instead that the content was simply waiting somewhere to be snatched by the recipient. The Court does not find that this theory comports with reality, particularly in light of the Supreme Court's observation that "[u]nlike communications received by radio or television, 'the receipt of information on the Internet requires a series of affirmative steps more deliberate and directed than merely turning a dial.'" *Reno*, 521 U.S. at 854, 117 S.Ct. 2329. The realistic theory is the Government's: that the servers transmitted the allegedly obscene stories to this District, that Defendant allegedly aided and abetted this transmission, and that Defendant properly faces prosecution in this District. Venue, therefore, is not improper in the Middle District of Georgia.

For the reasons articulated above, Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33) is **DENIED**.

Defendant's Addendum to Motion to Dismiss for Improper Venue (Doc. 35) asserts that this Court's denial of his improper venue motion should be immedi-ately appealable to the Eleventh Circuit. (Doc. 31 at 1). The Court does not agree that Defendant's improper venue claim carries the same imminent constitutional considerations as a claim of double jeopardy or a prosecution touching the Speech or Debate Clause. (See Doc. 35 at 2 to 3). Contrary to Defendant's assertion that the Indictment "fails to establish constitutional criminal venue in [this] district" (Doc. 35 at 4), the Court's reasoned legal analysis above clearly establishes that venue is proper in this District under the Indictment. Were the Court to grant leave for an interlocutory appeal under these circumstances, then this Court and the Eleventh Circuit would be flooded with requests for interlocutory appeals from virtually every future denial of an improper venue motion. The Eleventh Circuit has clearly stated that "an immediate appeal will not lie from an order pertaining to venue in a criminal case." *United States v. Snipes*, 512 F.3d 1301, 1301–02 (11th Cir.2008) ("[T]his Court lacks jurisdiction over this appeal under the collateral order doctrine. We conclude that an order pertaining to venue is effectively reviewable *after entry of judgment*" (emphasis added).). This Court must follow the Eleventh Circuit's clear precedent, particularly where the order is unlikely to be granted on appeal and the appeal would serve only to unnecessarily further delay disposition of the case. Therefore, the Court refuses to grant leave for an interlocutory appeal of the Court's denial of Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33).

### III. DEFENDANT'S MOTION TO DISMISS THE INDICTMENT ON MULTIPLE GROUNDS OF PRECLUSION AND ESTOPPEL (Doc. 34)

Defendant's Motion to Dismiss the Indictment on Multiple Grounds of Preclu-

sion and Estoppel (Doc. 34) asserts that the pair of Orders from the District of Minnesota, issued in November and December of 2005, which denied the Government's request for a search warrant of Defendant's home by finding that no crime of obscenity had occurred, caused the criminal prosecution of Defendant to be "litigated to a conclusion." (Doc. 34 at 8).[3] Therefore, argues Defendant, "the indictment against him must be dismissed on one or another ground of preclusion." (Doc. 34 at 9). The grounds of preclusion that Defendant cites in his Motion are (i) res judicata; (ii) collateral estoppel; (iii) law of the case doctrine; (iv) judicial estoppel; and (v) equitable estoppel. (Doc. 34 at 22). In its Response,[4] the Government states that Defendant's claims are "erroneous" and should be denied. (Doc. 51 at 17). At oral argument, the Parties focused exclusively on Defendant's res judicata grounds of preclusion. (See Doc. 111 at 33 to 61). Guided therefore by the emphasis provided by the Parties—and particularly by Defendant[5]—the Court's following Discussion will focus mainly upon res judicata. For the following reasons, Defendant's Motion to Dismiss the Indictment on Multiple Grounds of Preclusion and Estoppel (Doc. 34) is **DENIED.**

## A. Res Judicata
### 1. Parties' Arguments

Defendant argues in his Motion that "[s]ince the Minnesota litigation culminated in final judgments on the merits, any subsequent claim, anywhere, based on the same showing faces a judgment bar, as claims that are the subject of final judgments on their merits are entitled to res judicata effect." (Doc. 34 at 10). Defendant bases this argument on an Eleventh Circuit case from 1994, which cites and quotes a 1990 Eleventh Circuit decision for the proposition that "a federal court must apply federal law to determine the preclusive effect of a prior federal court decision," and that "[t]he doctrine of res judicata in federal law prohibits 'the filing of claims which were raised or could have been raised in an earlier proceeding.'" *United States v. Barnette*, 10 F.3d 1553, 1561 (11th Cir.1994) (quoting *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir.1990)); (see Doc. 34 at 9 to 10). Defendant recognizes that res judicata "prevents collateral attack on the result of a completed lawsuit between the same parties" (Doc. 34 at 10), "is inapplicable unless the earlier case proceeded to final judgment on the merits" (id. (citing *Bradford v. Bronner*, 665 F.2d 680, 682 (5th Cir.1982))), and "requires that respect be accorded the prior judgment." (Doc. 34

3. The Court will not address here Defendant's ancillary assertions regarding the Government's alleged delayed production of discovery (Doc. 34 at 2 to 4) or the "virtual certainty" that the Government did not inform the Middle District of Georgia Grand Jury of the Orders from the District of Minnesota (Doc. 34 at 8 to 9), because they are not relevant to the issues addressed in Defendant's Motion and were not developed beyond the "Factual Background" section of Defendant's Motion. (See Doc. 34).

4. The Court notes that the text of the Government's original Response of September 22,

2008 (Doc. 43) and "Corrected" Response of November 3, 2008 (Doc. 51) are identical. The Court will cite herein only to the Government's "Corrected" Response (Doc. 51).

5. At oral argument, Defendant stated that "the motion itself . . . involved a bit of arguing in the alternative because we weren't certain what position [the Government] would take. [Defendant] covered all bases and waited for them to respond so that in our reply, *we could hone down our argument to the exact, precise argument that would be left over after their response.*" (Doc. 111 at 33 (emphasis added)).

at 11). Defendant catalogs examples from case law regarding the "binding res judicata effect in a subsequent private federal action under 42 U.S.C. § 1983" of "a state court's determination of probable cause" (Doc. 34 at 11 to 13), and uses those examples to argue that "if federal courts afford state-court probable cause determinations (that constitute final judgments on the merits) res judicata effect—then surely a federal court would extend the same to another court." (Doc. 34 at 13). Based on this recognition, Defendant concludes that "the written opinions of Judge Noel and Judge Montgomery constitute final and binding judgments as to the government's claim" and therefore that "the government is barred from attempting to relitigate the claim while shopping around the country for a favorable ruling from a court that it believes may be more friendly." (Doc. 34 at 14).

▪ The Government's Response states that Defendant had failed to provide "any authority for its proposition that the denial of an application for a federal search warrant in the District of Minnesota constitutes a 'final judgment' precluding ... a Middle District of Georgia grand jury from returning an indictment." (Doc. 51 at 17 to 18). Based on Seventh Circuit precedent, the Government argues that "the denial of an application for a search warrant does not preclude the Government from presenting the very same application to a second magistrate in the same district." (Doc. 51 at 18 (citing *United States v. Pace*, 898 F.2d 1218, 1230–31 (7th Cir. 1990) and *United States v. Savides*, 658 F.Supp. 1399, 1402 (N.D.Ill.1987), and citing as *contra United States v. Davis*, 346 F.Supp. 435, 442 (S.D.Ill.1972))). Therefore, argues the Government, "the denial of a search warrant application could not possibly constitute a 'final judgment' affecting the authority of a grand jury in another district from making a probable cause determination." (*Id.*). The Govern-

ment further argues, under Supreme Court precedent, that "a magistrate judge's ruling regarding an application for search warrant has no bearing on any matter other than that particular application being presented at that time." (Doc. 51 at 18–19 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.")))). Finally, looking at the facts of the instant case, the Government observes that the Opinions from the District of Minnesota were not the first findings regarding probable cause: Federal Magistrate Judges in the Northern District of Texas (Hon. Irma C. Ramirez) and the Middle District of Georgia (Hon. Richard L. Hodge) had earlier granted search warrants regarding this criminal matter, albeit by a matter of hours. (Doc. 51 at 10 to 11, 18 n. 1). Therefore, the Government argues, "if one were to accept the reasoning of the defense with respect to the affect [sic] of a magistrate's ruling on an application for search warrant, the [N.D. Tex. and M.D. Ga.] rulings that probable cause existed ... would control since they were entered ... prior to [Judge Noel] entering his order and amended order." (Doc. 51 at 18 n. 1).

Defendant's Reply argues that his previous cataloguing of "citations discussing the binding res judicata effect, in federal litigation, of prior state court probable cause determinations" provides ample case law regarding final judgment. (Doc. 47 at 3). Based upon two District Court opinions from separate districts in Illinois, Defendant argues that preclusive effect should be given to both a magistrate's refusal to sign a search warrant (Doc. 47 at 3 (citing

*United States v. Davis,* 346 F.Supp. 435, 442 (S.D.Ill.1972))), and a magistrate's refusal to sign if the government is given the chance to appeal that refusal (*id.* (citing *United States v. Savides,* 658 F.Supp. 1399, 1404 (N.D.Ill.1987))). Defendant therefore argues that, based on the facts from the District of Minnesota wherein the Federal Magistrate Judge's refusal to issue a search warrant was memorialized in a written order and the appeal to the District Court Judge was denied on constitutional grounds in a memorandum opinion and order, "[t]here can be no doubt ... that what happened ... had all the hallmarks of a final judgment between these same parties, on the same matter." (Doc. 47 at 3 to 4). Following a cataloguing of cases in which he emphasizes the proposition that an essential element of res judicata doctrine is the opportunity to fully and fairly litigate a claim (Doc. 47 at 4 to 5), Defendant also cites case law stating that a "final order of judgment" requires "some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as [the court] is concerned is the end of the case." (Doc. 47 at 5 (quoting *Illig v. Union Elec. Co.,* 334 F.Supp.2d 1151, 1155 (E.D.Mo.2004))). Defendant concludes that because all of the hallmarks of res judicata were present, "leaving nothing remaining to be done with respect to the litigation," the District of Minnesota Orders "constitute a final judgment[ ] and present a res judicata bar to re-litigation of the case." (Doc. 47 at 5 to 6).

At oral argument, Defendant introduced two Supreme Court cases from the 1925 term for the proposition that a district judge's refusal to vacate a warrant is a final decree. (Doc. 111 at 40 to 44). Aside from this addition, no new argument was introduced at the hearing. (See Doc. 111 at 33 to 61).

## 2. Court's Analysis and Conclusion

Turning initially to Defendant's recitation of the elements of res judicata in his Reply brief, the Court finds that the search warrant "claim" was *not* fully and fairly litigated (*see* Doc. 47 at 4 to 5) because one party to the present litigation—Defendant—was not even involved in the Minnesota presentations, deliberations, or determinations. The only parties participating were the Government, the Federal Magistrate Judge, and, later, the District Court Judge. Furthermore, while Defendant argues that a "final order of judgment" requires "some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as [the court] is concerned is the end of the case" (Doc. 47 at 5), the Orders from the District of Minnesota submitted by Defendant clearly lack such language. Judge Noel's Order only denies the search warrant application, albeit with the disclaimer that "the Court is unwilling to subscribe to the Government's effort to criminalize the written word." (Doc. 34–2 at 5). Judge Noel did not indicate that the case was concluded as far as he was concerned. Likewise for Judge Montgomery's decision, which ultimately adopts Judge Noel's ruling and denies the search warrant application. (Doc. 34–2 at 15). Nowhere does Judge Montgomery state that judgment has been rendered and the case closed. In fact, Judge Montgomery indicates an expectation of a future search warrant application in her proposition that "[i]f the search warrant application contained any indication that any of the nineteen stories were descriptions of actual events the author perpetrated or witnessed, *the outcome may well be different.*" (Doc. 34–2 at 14 (emphasis added)). Even under Defendant's own definition of res judicata, then, the facts of this case do not satisfy all of the requirements.

Defendant's definition of res judicata, however, is inapplicable in the context of this case. The Supreme Court stated in 1948 that "res judicata ... applies to criminal as well as civil proceedings ... and operates to conclude those matters in issue which *the verdict* determined though the offenses be different." *Sealfon v. United States,* 332 U.S. 575, 578, 68 S.Ct. 237, 92 L.Ed. 180 (1948) (emphasis added). Nearly three decades later, the old Fifth Circuit interpreted *Sealfon* and its progeny to phrase "the criminal res judicata doctrine" in the following terms: "A question or issue determined by a *prior acquittal* may not be relitigated in a criminal proceeding against the same person." *Douthit v. Estelle,* 540 F.2d 800, 803 n. 5 (5th Cir.1976) (emphasis added). *Douthit* remains good law in the Eleventh Circuit. *See United States v. Hewitt,* 663 F.2d 1381, 1387–88 (11th Cir.1981) (citing *Douthit* for the proposition that "no collateral estoppel operated to bar prosecution"); *see also Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (adopting as binding precedent in the Eleventh Circuit all former Fifth Circuit decisions rendered before October 1, 1981).

The cases relied upon by Defendant do not deal with the res judicata effect of one criminal case upon another criminal case. Rather, the cases cited by Defendant— including *United States v. Barnette*—deal with the preclusive effect of either a criminal case upon a subsequent civil case or a civil case upon another civil case. In *Barnette,* for example, the defendant in a civil damages suit arising out of a criminal RICO conviction argued that the government should have been barred from bringing the civil suit because it could have brought the civil claims as part of the criminal trial. *United States v. Barnette,* 10 F.3d 1553, 1561 (11th Cir.1994). The Eleventh Circuit observed that "the doctrine of res judicata often has been held not to bar a civil case brought subsequent to a criminal trial.... Barnette has not cited any case from any jurisdiction that even hints that a prior criminal restitution order is res judicata against a subsequent damages action." *Id.* at 1561–62. Because Defendant's cited cases come from contexts inapplicable to the instant matter—one criminal case's preclusive effect on a second criminal case—his definition of res judicata is consequently inapplicable here. The Court will apply the definition that is appropriate here: that from *Douthit* and, earlier, *Sealfon.*

In the instant case, the Court finds that there has been no previous criminal "verdict," *Sealfon* at 578, 68 S.Ct. 237, or "acquittal," *Douthit* at 803 n. 5, and thus res judicata does not preclude the Grand Jury's subsequent criminal Indictment. The previous occurrences at issue are the separate Orders issued by a Federal Magistrate Judge and a District Court Judge denying the Government's application for a search warrant on grounds that no crime had been committed under those Judges' interpretations of Supreme Court precedent. Those decisions were not, as Defendant argues, final judgments on the merits. They were merely denials of a search warrant application where evidence was being sought to support a potential allegation of a criminal violation.

The only Federal Court of Appeal to consider the question found that the Fourth Amendment "on its face does not prohibit the government from seeking a second magistrate's approval to search when another magistrate denies a search warrant" and flatly rejected "[a] blanket rule barring the government from resubmitting a warrant application to a second magistrate." *United States v. Pace,* 898 F.2d 1218, 1230–31 (7th Cir.1990). Instead, the Seventh Circuit held that the Fourth Amendment's requirements were only "whether the magistrate really was

'neutral and detached,' and whether probable cause actually existed, *not how many magistrates the government applied to before finally obtaining a warrant.*" *Id.* at 1231 (emphasis added). Because the Supreme Court's opinion in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), allows for the validity of a search warrant even when the supporting affidavit contains knowingly false information so long as the other material in the warrant affidavit suffices to show probable cause, the Seventh Circuit reasoned that "[t]here is even less reason to suppress evidence from a search pursuant to a warrant issued by a magistrate who properly found probable cause based strictly on facts that the warrant affiant honestly and reasonably believed" although the request had been denied by a previous magistrate. *Pace,* 898 F.2d at 1231. The Seventh Circuit made this decision in full contemplation of the two district court decisions on which Defendant heavily relies in both his briefings and oral argument: *United States v. Savides—* which was the case on direct appeal to the Seventh Circuit—and *United States v. Davis.*

The Supreme Court decisions from the 1925 term that were introduced by Defendant at oral argument are unavailing. In *Steele v. United States* No. 2, the Supreme Court held that a District Court's "refusal to vacate the search warrant and to return the liquor seized was a final decree" and "is therefore res judicata as against" the defendant, a Prohibition-era bootlegger. *Steele v. United States,* 267 U.S. 505, 507, 45 S.Ct. 417, 69 L.Ed. 761 (1925). As explained in *Steele* No. 1, the National Prohibition Act provided for a judge or commissioner to issue a search warrant to seize liquor and its containers following a finding of probable cause, but if probable cause was controverted or a seized item was not described in the warrant then the property was to be returned. *Steele v.*

*United States,* 267 U.S. 498, 500–01, 45 S.Ct. 414, 69 L.Ed. 757 (1925). In an attempt to obtain his seized whiskey, the *Steele* defendant had attacked the issuing commissioner's probable cause determination, but the District Court had denied the defendant's motion to vacate the search warrant. *Id.* at 499–500, 45 S.Ct. 414. In *Steele* No. 1, the Supreme Court found the search warrant sufficient and affirmed the District Court's ruling. *Id.* at 505, 45 S.Ct. 414. In *Steele* No. 2, the Supreme Court addressed the question of whether the search warrant had been properly executed. *Steele,* 267 U.S. at 506, 45 S.Ct. 417. To arrive at the question, the Supreme Court first tackled the defendant's failure to raise the issue in the court below, which rendered the defendant "not in a position to raise the question" because "[t]he refusal to vacate the search warrant and to return the liquor seized was a final decree. The question is therefore res judicata against him." *Id.* at 507, 45 S.Ct. 417. The Supreme Court then launched into a discussion of why the District Court's ruling would be upheld even if the instant defendant were in a position to raise the question. *Id.* at 507–10, 45 S.Ct. 417. Before concluding, however, the Supreme Court restated that "the fact of the existence of probable cause in the issue of the search warrant was res judicata, made so by the judgment of the court in the case preceding that the property could not be returned to Steele." *Id.* at 511, 45 S.Ct. 417.

Defendant has not convinced the Court that the attachment of res judicata effect to a District Court's denial of a defendant's motion to vacate a search warrant under the National Prohibition Act logically leads to res judicata effect attaching to a District Court's denial of the Government's application for a search warrant under Federal Rule of Criminal Procedure 41. For starters, assuming the *Steele* cases survived the

end of the Prohibition era, *Steele* had been limited by a subsequent Supreme Court decision. In *Cogen v. United States,* the Supreme Court found that where "it is apparent that the motion to quash the search warrant [and for return of the property] is an incident merely; that the real purpose of the application is to suppress evidence; and that it is but a step in the criminal case preliminary to the trial thereof ... the order made on the motion is interlocutory merely." *Cogen v. United States,* 278 U.S. 221, 227, 49 S.Ct. 118, 73 L.Ed. 275 (1929). The District of Columbia Circuit explained that *Cogen* "narrowed the scope of *Steele* No. 2 even as to orders arising out of the separate proceedings provided in the National Prohibition Act." *Nelson v. United States,* 208 F.2d 505, 517–18 n. 54 (D.C.Cir.1953) (citing *Cogen,* 278 U.S. at 226, 49 S.Ct. 118). Thus, the proposition from the *Steele* cases on which Defendant relies applies only to motions for the return of property under the National Prohibition Act. Furthermore, and quite simply, a judge's ruling that probable cause exists is different than a ruling that probable cause is lacking. A finding of probable cause is an affirmation that the Government has adduced evidence sufficient to meet a certain constitutional threshold. Such a finding is generally permanent; barring Governmental misconduct, the Government's evidence does not risk wilting below the threshold in the future. On the other hand, a finding that probable cause is lacking states nothing more than that the Government has not yet met the threshold. Nothing prevents the Government from gathering more evidence and making more attempts until the threshold is achieved, similar to the Supreme Court permitting the Government to submit its evidence to later grand juries following a grand jury's return of no true bill. *See United States v. Thompson,* 251 U.S. 407, 414–16, 40 S.Ct. 289, 64 L.Ed. 333 (1920). A finding of no probable cause, then, is not permanent. Therefore, assuming that *Steele* No. 2 reaches to the present day and instant circumstances, its holding nevertheless does not apply in this case to render the District of Minnesota Orders res judicata.

The Court finds that, because the Fourth Amendment and *Franks v. Delaware* allow for the re-application of a previously denied search warrant request, a Federal Magistrate Judge's denial of a search warrant application cannot be a final judgment on the merits. *Accord Pace,* 898 F.2d at 1230–31. Nor, it follows, is a Federal District Court Judge's adoption on appeal of that Federal Magistrate Judge's denial a final judgment on the merits. Pursuant to this finding, the Orders of Judge Noel and Judge Montgomery have no res judicata effect on the subsequent criminal Indictment returned by the Middle District of Georgia Grand Jury against Defendant.

### B. Collateral Estoppel

#### 1. Defendant's Argument

Defendant argues that "in any subsequent litigation involving the same class and character of fictional stories (under the same or similar facts), relitigation (by the government) of the constitutional issues that were resolved by the Minnesota court is collaterally estopped." (Doc. 34 at 10). Defendant also cites case law that "there is some authority that the requirement [of finality of the prior judgment] is more relaxed for collateral estoppel or issue preclusion." (Doc. 47 at 6 (quoting *Kaspar Wire Works, Inc. v. Leco Eng'g & Machine, Inc.,* 575 F.2d 530, 538 n. 11 (5th Cir.1978))).

#### 2. Court's Analysis and Conclusion

For the reasons explained above that the District of Minnesota decisions regarding the search warrant applications were not "litigations," the collateral estoppel

doctrine, as defined by Defendant, is inapplicable to this case. And as with his res judicata argument, Defendant's definition of collateral estoppel suffers from being culled from the incorrect context. *Kaspar Wire Works* was a patent infringement matter, applying the civil notion of collateral estoppel. *See Kaspar Wire Works,* 575 F.2d at 532.

■ Collateral estoppel in the criminal context "is a narrow exception to the Government's right to prosecute a defendant in separate trials for related conduct." *United States v. Quintero,* 165 F.3d 831, 835 (11th Cir.1999) (quoting *United States v. Brown,* 983 F.2d 201, 202 (11th Cir. 1993)). Collateral estoppel applies in the criminal context "when an issue of ultimate fact has once been determined by a valid and final judgment." *Id.* (quoting *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)). In other words, collateral estoppel "bars a subsequent prosecution only where a fact or issue necessarily determined in the defendant's favor in the former trial is an essential element of conviction at the second trial." *United States v. Magluta,* 418 F.3d 1166, 1174 (11th Cir.2005) (quoting *Brown,* 983 F.2d at 202). In the Eleventh Circuit, an analysis of criminal collateral estoppel is comprised of two steps. *United States v. Ohayon,* 483 F.3d 1281, 1286 (11th Cir. 2007). "First, the Court must decide whether it can ascertain the basis of the acquittal at the first trial." *Quintero,* 165 F.3d at 835 (quoting *United States v. Garcia,* 78 F.3d 1517, 1521 (11th Cir.1996)). "More precisely, a court must determine whether the jury's verdict of acquittal was based upon reasonable doubt about a single element of the crime which the court can identify." *Magluta,* 418 F.3d at 1174 (quoting *Brown,* 983 F.2d at 202). "Second, the court must determine whether the elements of the crime upon which the prior acquittal was based are also essential elements of the crime for which the defendant

is to be retried." *Quintero,* 165 F.3d at 835 (quoting *Garcia,* 78 F.3d at 1521).

Clearly, criminal collateral estoppel does not apply to the current case. Defendant has not yet faced trial. Defendant has not been acquitted. And Defendant is not currently facing a second trial in which the elements of a previous acquittal are essential. As explained above, the Court does not find that the Orders from Judge Noel and Judge Montgomery were valid and final judgments for purposes of res judicata or collateral estoppel. Therefore, collateral estoppel is inapplicable here.

## C. Law of the Case Doctrine
### 1. Defendant's Argument

Defendant states that "[t]he law of the case doctrine ... prevents collateral attacks against the court's rulings during the pendency of a lawsuit." (Doc. 34 at 10). Defendant asserts that "[t]he rationale on which the law of the case doctrine is based is the same as that for *stare decisis*—when a district judge has rendered a decision in a case, and the case is later transferred to another judge, the successor should not ordinarily overrule the earlier decision." (Doc. 34 at 11 (citing *Loumar, Inc. v. Smith,* 698 F.2d 759, 762 (5th Cir.1983))).

### 2. Court's Analysis and Conclusion

Nowhere does the Docket indicate that this case has been transferred from any other court. (*See* Docket). Therefore, the law of the case doctrine, as defined by Defendant, is inapplicable to this case.

■ In the Eleventh Circuit, "[t]he law of the case doctrine applies in both the civil and criminal context." *United States v. Means,* 135 Fed.Appx. 293, 295 (11th Cir.2005) (citing *Alphamed, Inc. v. B. Braun Medical, Inc.,* 367 F.3d 1280, 1286 n. 3 (11th Cir.2004)). The law of the case doctrine states that "an issue decided at one stage of a case is binding at later

stages of the same case." *United States v. Escobar–Urrego,* 110 F.3d 1556, 1560 (11th Cir.1997). In other words, "a decision of a legal issue or issues ... establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court." *Id.* at 1561 (quoting *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967)). While the law of the case doctrine is an important policy, it "is not an inexorable command," and exceptions exist if "the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Id.* (quoting *White,* 377 F.2d at 431–32).

■ After examining the Orders by Judge Noel and Judge Montgomery, the Court finds that the issue decided by the District of Minnesota was the denial of the search warrant application. (*See* Doc. 34–2 at 5 (Judge Noel deciding that "The application for the Search Warrant must be DENIED"); Doc. 34–2 at 15 (Judge Montgomery denying the appeal and adopting Judge Noel's Order regarding the search warrant)). The issue decided was not, as Defendant argues, the Judges' refusal to find probable cause on constitutional grounds. While the refusal to "criminalize the written word" (Doc. 34–2 at 5) was an express component of the Judges' Orders, the issue decided was not whether a crime had been committed but whether probable cause existed to issue a search warrant based upon "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Because the Grand Jury Indictment relies in no part upon the search warrant application denied by Judge Noel and Judge Montgomery, the law of the case doctrine is inapplicable as so presented by Defendant.

### D. Judicial Estoppel

#### 1. Parties' Arguments

Defendant's Motion argues that, while before the District of Minnesota the Government had stated the facts of the case as "McCoy emailed the stories" (Doc. 34–2 at 7) to the Middle District of Georgia, the Government's version of the facts before the Middle District of Georgia has been that "McCoy sent an email into this district, instructing Agent Brant where his stories may be found." (Doc. 34 at 15). Because of this inconsistency—that in one forum the Government said the email contained *the stories,* while in another forum the Government said the email contained only *links to* the stories—Defendant argues that "the government ought to be judicially estopped from asserting a factually inconsistent position in these proceedings." (Doc. 34 at 16). Defendant argues that the facts of this case satisfy all three of the factors described by the Eleventh Circuit in *Stephens v. Tolbert:* "(1) whether a later position asserted by a party was clearly inconsistent with an earlier position; (2) whether a party succeeded in persuading a court to accept an earlier position, 'so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'; and (3) whether the party with an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." (Doc. 34 at 16 (quoting *Stephens v. Tolbert,* 471 F.3d 1173, 1177 (11th Cir.2006))).

The Government's Response argues that the Government's statement before the District of Minnesota "was (at worst) an inartful colloquial summarization of the

facts set forth in Agent Shold's affidavit, which were ... the same facts presented to the grand jury sitting in the Middle District of Georgia which returned the indictment." (Doc. 51 at 21).

Defendant's Reply observes that, in the Government's Motion for Order to Unseal Case filed with the District of Minnesota on May 9, 2008 (Doc. 46–9), the Government again asserted the factual position that "McCoy had ... sent [these stories] via email to an undercover police officer in Georgia" (Doc. 46–9 at 1). (Doc. 47 at 9). Defendant argues that this version of the facts—that the email contained the stories—should "be characterized as the government's consistently asserted position before [the Minnesota] court" and causes the Government's argument in its Response to become "considerably less tenable owing to the fact that the representation was made twice." (Doc. 47 at 9).

### 2. Court's Analysis and Conclusion

■ The *Stephens v. Tolbert* factors are not, as Defendant argues, satisfied by the facts of this case. First, while it may appear inconsistent on the micro level to state in one forum that the email contained the stories and state in another forum that the email contained links to the stories, looking from the macro level—the totality of the case—this factual difference does not appear "clearly inconsistent." *Stephens*, 471 F.3d at 1177. Although one version of the facts asserts Defendant's principal liability and the other asserts accessory liability, these positions are not "clearly inconsistent" in light of the fact that "[a]iding and abetting need not be specifically alleged in the indictment; assuming the evidence supports it, the accused can be convicted of aiding and abetting so long as the jury is instructed on it." *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir.1984). Defendant's accessory liability was, it follows, always implied. Second, the Government clearly did not

"succeed[ ] in persuading a court to accept [the] earlier position," *Stephens*, 471 F.3d at 1177, because the District of Minnesota denied the search warrant application. Third, the Government derives no "unfair advantage" nor imposes any "unfair detriment" on Defendant through this "inconsistent position," *Stephens*, 471 F.3d at 1177, because no search warrant was obtained from the District of Minnesota—a detriment to the Government and an advantage to Defendant—and because it would be an absurdity to find that holding the parties to the true facts of the case is "unfair." The facts are what they are.

Once again, Defendant draws mainly from a civil case—*Stephens v. Tolbert* was a false arrest claim—in support of his position rather than from criminal actions. To his credit, Defendant cites with a "see also" the Eleventh Circuit's more-recent criminal decision of *United States v. Campa*. (Doc. 34 at 16). *Campa*, though, does not assist Defendant. There, the Eleventh Circuit instructed that "[c]ourts consider two factors in determining whether to apply the doctrine [of judicial estoppel]: whether the 'allegedly inconsistent positions were made under oath in a prior proceeding' and whether such inconsistencies were 'calculated to make a mockery of the judicial system.'" *United States v. Campa*, 459 F.3d 1121, 1152 (11th Cir. 2006). The second factor is clearly not satisfied here: the Court finds that in no way were the Government's inconsistent renditions of the facts of this case "calculated to make a mockery of the judicial system." *Campa*, 459 F.3d at 1152. The Court, therefore, will not invoke judicial estoppel here.

### E. Equitable Estoppel

#### 1. Defendant's Argument

Defendant's Motion argues that the Court should impose equitable estoppel,

and argues strenuously under *United States v. Davis* and *United States v. Savides*. (Doc. 34 at 17 to 21). Defendant concludes that "in the instant case the government was equitably estopped from convening the Middle District of Georgia Grand Jury upon the same showing that was the subject of the [sic] Judge Montgomery's ruling on appeal." (Doc. 34 at 21).

### 2. Court's Analysis and Conclusion

 Nowhere does Defendant state the standard this Court should apply in evaluating his claim for equitable estoppel. (*See* Doc. 34 at 17 to 21). Unlike judicial estoppel, which "protects the sanctity of the oath and the integrity of the judicial process," equitable estoppel "is designed 'to ensure fairness in the relationship between the parties.'" *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir.1993) (quoting *Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C.Cir.1980)). More than a century ago, the Supreme Court stated that equitable estoppel is the "general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895). Modern federal courts have stated that the party seeking to invoke equitable estoppel "must have been an adverse party in the prior proceeding, must have acted in reliance upon his opponent's prior position, and must now face injury if a court were to permit his opponent to change positions." *Konstantinidis*, 626 F.2d at 937. Aside from arguing that he was the adverse party in the prior

District of Minnesota search warrant deliberations,[6] Defendant has shown neither reliance nor injury nor that the Government is attempting to change positions. Therefore, this Court will not apply equitable estoppel here.

For the foregoing reasons, Defendant's Motion to Dismiss the Indictment on Multiple Grounds of Preclusion and Estoppel (Doc. 34) is **DENIED.**

### IV. DEFENDANT'S MOTION TO DISMISS INDICTMENT ON GROUNDS OF GOVERNMENT MISCONDUCT BEFORE THE GRAND JURY (Doc. 50)

Defendant's Motion to Dismiss Indictment on Grounds of Government Misconduct Before the Grand Jury (Doc. 50) asserts that the Government's failure to inform the Grand Jury of the Middle District of Georgia of the refusal by the Federal Magistrate Judge and Federal District Court Judge in the District of Minnesota to issue search warrants rendered the Grand Jury unable to "independently make its probable cause determination" and "substantially influenced the Grand Jury's decision to indict, in derogation of [Defendant's] rights under the Fifth Amendment." (Doc. 50 at 1). Defendant asserts that by failing to submit the District of Minnesota Orders to the Grand Jury, the Government caused a "material omission" that amounts to "prosecutorial misconduct." (Doc. 50 at 8). Defendant asserts that the necessary remedy is "dismissal of the indictment in this case." (*Id.*). For the following reasons, Defendant's Motion to Dismiss Indictment on Grounds of Government Misconduct Before the Grand Jury (Doc. 50) is **DENIED.**

---

**6.** Again, because Defendant was not actually involved in the District of Minnesota search warrant presentations, deliberations, or determinations, the Court finds it a stretch to consider Defendant an adverse party therein.

### A. Parties' Arguments

Defendant's Motion argues that because "the government insufficiently instructed the Grand Jury on the facts and law necessary for it to independently make its probable cause determination—particularly, that the Grand Jury's deliberations were misled by the government's material omission of the 2005 Minnesota litigation and judgment, and the attendant possible legal consequences and implications thereof," the alleged failure "substantially influenced the Grand Jury's decision to indict, in derogation of [Defendant's] rights under the Fifth Amendment." (Doc. 50 at 1). Defendant asserts that the Indictment returned by the Grand Jury should be summarily dismissed because the Government's alleged "material omission of fact, and legal instruction, before the Grand Jury was obviously made with the intent of precluding a line of relevant inquiry—all of which served to deny the Grand Jury of its independent role and constitutional freedom." (Doc. 50 at 3). Based on an unpublished opinion from the Southern District of New York, Defendant asserts that "the government is ... required to give the grand jury sufficient information concerning the relevant facts and law such that it can 'intelligently to [sic] decide whether a crime has been committed'" and that the Government's legal "instruction (or lack thereof) may be 'so misleading due to mistakes *or omissions,* that the ensuing indictment will not be permitted to stand.'" (Doc. 50 at 4 (quoting *United States v. Twersky,* No. S2 92 Cr. 1082(SWK), 1994 WL 319367 at *4, 1994 U.S. Dist. LEXIS 8744 at *11–12 (S.D.N.Y. June 29, 1994) (emphasis Defendant's))). Citing Supreme Court and Eleventh Circuit case law, Defendant argues that to dismiss an indictment the Court must find "an abuse of the grand jury process such as ... government misconduct" that "has somehow infected the indictment itself" by "showing 'that the violation substantially influenced the grand jury's decision to indict.'" (Doc. 50 at 5 to 6 (quoting, respectively, *United States v. Pettway,* 129 Fed.Appx. 583, 589 (11th Cir.2005); *United States v. Shelley,* 405 F.3d 1195, 1208 (11th Cir.2005); *United States v. Exarhos,* 135 F.3d 723, 726–27 (11th Cir.1998))). In other words, argues Defendant, "in order to dismiss an indictment on grounds of prosecutorial misconduct before a grand jury, this Court must find an abuse of the grand jury process." (Doc. 50 at 7 (citing *United States v. Hyder,* 732 F.2d 841, 845 (11th Cir.1984))). Defendant "maintains that the government's material omission before the Grand Jury in this case represents exactly such abuse of the grand jury process" and "necessarily denied that body of its historic role, and [Defendant] of his Fifth Amendment right to indictment by an independent and intelligent grand jury—thus, necessitating a dismissal of the indictment in this case." (Doc. 50 at 8).

The Government's Response asserts that Defendant's Motion should be denied. (Doc. 58 at 1). The Government sets out Defendant's three failings as follows. First, argues the Government, "the Minnesota Orders are irrelevant to the grand jury proceedings in the Middle District of Georgia under *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)." (Doc. 58 at 2). The Government argues that because two factors of the *Miller* test for obscenity "turn[ ] on the 'community standards' of the jurisdiction prosecuting the alleged violation of the law," and that because the Grand Jury returning the Indictment applied the community standards of the Middle District of Georgia, "[a]ccordingly, the Minnesota Orders denying a search warrant application for lack of probable cause issued in the District of Minnesota have no legal bearing." (Doc. 58 at 9 to 10). The Government argues that "Defendant's argument that the Georgia [federal] grand jury

should have been made aware of the Minnesota Orders is erroneous. Because those orders turn upon probable cause determinations based on Minnesota community standards, they are utterly irrelevant to the Georgia grand jury's decision to issue the indictment in this case." (Doc. 58 at 13). In support, the Government quotes case law from the Ninth Circuit stating that "a magistrate in a locality is presumed to know the standards of the community of which he is a part" and quotes the portion of Judge Noel's Amended Order in which he stated that he was "applying contemporary Minnesota standards." (Doc. 58 at 13 (quoting *United States v. Levinson,* 991 F.2d 508, 510 (9th Cir.1993))). Concludes the Government: "the community standards applied in Minnesota have no bearing on the grand jury's determination in Georgia." (Doc. 58 at 14).

Second, argues the Government, "assuming, *arguendo,* that the Minnesota Orders are relevant to the Georgia proceeding, there is no ground for dismissal as Defendant cannot demonstrate the actual prejudice necessary to overcome the presumption of regularity that governs grand jury proceedings." (Doc. 58 at 2). The Government asserts that "[t]here is a presumption of regularity that attaches to grand jury proceedings" (Doc. 58 at 14 (citing *United States v. R Enterprises, Inc.,* 498 U.S. 292, 301, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991))) which acts in such a way that "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." (Doc. 58 at 15 (quoting *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988))). Supreme Court precedent cited by the Government states that an indictment's dismissal is appropriate "only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt

that the decision to indict was free from the substantial influence of such violations." (Doc. 58 at 15 (quoting *Bank of Nova Scotia,* 487 U.S. at 256, 108 S.Ct. 2369)). The Government argues that the presumption of regularity "operates forcefully in this case" because "Defendant cannot demonstrate that the Government engaged in any impropriety, much less any impropriety that 'substantially influenced' the grand jury's decision to indict and amounted to prejudicial error." (Doc. 58 at 16). The Government also observes that if Defendant wants the District of Minnesota Orders denying a search warrant to be submitted to the Grand Jury, then the Grand Jury should also be presented with the Northern District of Texas and Middle District of Georgia orders granting search warrants—which would likely prompt Defendant to file a motion to dismiss the indictment for prosecutorial misconduct "on grounds that the presentation of such orders usurped the independent function of the grand jury and was an attempt by the Government to have the [grand] jury substitute the determination and judgment of [the Federal Magistrate Judges] for its own as to whether the matters were obscene and a violation of 18 U.S.C. § 1462 had been committed." (Doc. 58 at 16 n. 7).

Third, the Government argues that "the Minnesota Orders are erroneous and squarely contradict well-established Supreme Court precedent recognizing that written materials may be obscene within the meaning of *Miller.*" (Doc. 58 at 2). In support of this argument, the Government cites the Supreme Court's opinion of *Kaplan v. California* for the proposition that "[o]bscenity can, of course, manifest itself in conduct, in the pictoral representation of conduct, *or in the written* and oral *description of conduct.*" (Doc. 58 at 17 (quoting *Kaplan v. California,* 413 U.S.

115, 118–19, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973) (emphasis Government's))).

Defendant's Reply (Doc. 62) answers the Government's three arguments in turn. First, Defendant argues that the District of Minnesota Orders were not grounded on "some particularity relevant to Minnesotan sensibilities," but on the notion that "a prosecution under these facts would be foreclosed by the protected-speech holding of *Ashcroft.*" (Doc. 62 at 3). Because, argues Defendant, "[t]he Minnesota court's holding was unequivocally based on the Supreme Court's holding in *Ashcroft,*" it therefore "turned on a matter of federal constitutional law, not on an application of Minnesotan sensibilities." (Doc. 62 at 4 to 5). Defendant further counters the Government's first argument by asserting that the Grand Jury was "denied ... of its role and function as a 'buffer or referee between the government and the people'" and that the "denial came in the form of a material omission in the government's presentation to that body, calculated to preclude the [Grand Jury's] certain refusal to indict that would have been forthcoming" because "if properly informed, [the Grand Jury] would have asked: is it even possible to construe written fictional descriptions as enjoying any less protected speech status under *Ashcroft* than similar visual depictions (at least as to the reach of federal criminal power)? ... [H]ad it been properly informed it never would have indicted him." (Doc. 62 at 6 to 7). Defendant then argues that "the government's contention that an indictment would have been returned anyway is simply not maintainable, as it would amount to venturing 'a guess as to what was in the minds of the grand jury at the time.'" (Doc. 62 at 7 (quoting *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962))).[7] Defendant concludes that to be proper under the law the Government should have informed the Grand Jury of "(1) the facts surrounding the 2005 litigation and appeal of the same facts underlying this prosecution; (2) the findings, holdings, and reasoning of those judicial officers, including a candid explanation of their reliance on the Supreme Court's protected-speech for fiction holding in *Ashcroft;* and, [sic] (3) some minimal legal instruction on the concepts of claim and issue preclusion." (Doc. 62 at 7).

Second, Defendant argues that he can demonstrate the requisite harm in the alleged prosecutorial misconduct before the Grand Jury in that "it is a certainty that the Grand Jury in this case would never have returned an indictment if it had the slightest inkling of the futility of doing so (namely, that this prosecution was squarely foreclosed by the Supreme Court's holding in *Ashcroft;* moreover, that it was precluded by *res judicata* or collateral estoppel, based on the final judgment of the ... District of Minnesota, holding that this prosecution is foreclosed by the Supreme Court's holding in *Ashcroft* )." (Doc. 62 at 9 to 10).

---

**7.** It does not escape the Court's attention that *on the very same page* that Defendant, quoting Supreme Court case law, chastises the Government for "guess[ing] as to what was in the minds of the grand jury at the time" (Doc. 62 at 7 (quoting *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962))), Defendant engages in the same admonished conduct by stating that had the Grand Jury been "properly informed it never would have indicted [Defendant]." (Doc. 62 at 7 (emphasis added)). Similarly, just two pages later Defendant asserts that "it is a certainty that the Grand Jury in this case would never have returned an indictment if it had the slightest inkling of the futility of doing so." (Doc. 62 at 9). It is an interesting trial strategy to rail against an opponent's sins while committing the same transgressions in the same breath.

Third, Defendant argues that the Government's reliance upon *Kaplan v. California* is misplaced because "[a]lthough ... the [Supreme] Court did hold that obscenity *may* exist in purely written form, the case had no application to the facts [of Defendant's case] (the same facts, of course, which were before the Minnesota judges)." (Doc. 62 at 11). Defendant asserts that "*Kaplan* is therefore not in the least bit relevant to an inquiry to determine whether *Ashcroft's* recent holding on protected-speech status for fiction (with regards to the First Amendment's limitations on the reach of federal criminal power) controlled these facts." (Doc. 62 at 12 (emphasis Defendant's)).

At the oral hearing, the Parties based their arguments on their written briefings and submitted no new arguments. (*See* Doc. 111 at 62 to 74).

**B. Court's Analysis and Conclusion**

■ To understand the Court's ruling on Defendant's Motion (Doc. 50), it is important to appreciate the federal criminal statutes and Supreme Court jurisprudence relevant to the Indictment. Because the Court further discusses the statutory and case law *infra* in addressing Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72), the following is intended by the Court as a discussion relevant to only the instant Motion (Doc. 50).

The Indictment charges Defendant with violating 18 U.S.C. § 1462, Transportation of Obscene Matters. (Doc. 1). Therefore, this is an "obscenity" case. Although the stories for which Defendant is charged describe sexual acts with children, this is *not*—the Court emphasizes the word *not*— a "child pornography" case. Child pornography is addressed in separate sections of United States Code Title 18. *See, e.g.,* 18 U.S.C. § 1466A (statute criminalizing "[o]bscene visual representations of the

sexual abuse of children"). The Indictment does not contain a "child pornography" charge against Defendant. (*See* Doc. 1). In fact, a "child pornography" charge against Defendant would have been erroneous under the current facts because child pornography "consists of sexually explicit *visual* portrayals that feature children," *United States v. Williams,* 553 U.S. 285, 288, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (emphasis added), and the Indictment alleges that Defendant only wrote non-illustrated stories describing child sex. This, therefore, is strictly an obscenity case.

In *Ashcroft v. Free Speech Coalition*— the case heavily relied upon by Defendant—the Supreme Court recognized the difference between "obscenity" on the one hand, and "pornography produced with real children" on the other. *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 245–46, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children."). Obscenity, the Supreme Court stated, is controlled by the *Miller v. California* line of cases, while child pornography is controlled by the separate *New York v. Ferber* line of cases. *Id.* at 240, 122 S.Ct. 1389. Explained the Supreme Court: "[U]nder *Ferber,* pornography showing [real] minors can be proscribed *whether or not* the images are obscene under the definition set forth in *Miller v. California* " because " '[t]he *Miller* standard, like all general definitions of what may be banned as obscene, does not reflect *the State's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children.*' " *Id.* (quoting *New York v. Ferber,* 458 U.S. 747, 761, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)) (emphasis added). The Supreme Court, therefore, recognized

that child pornography and obscenity are different categories of unprotected speech, with separate doctrines of law and public policy governing their respective exceptions to the First Amendment. *See id.* at 249, 122 S.Ct. 1389 ("*Ferber* recognized that the State had an interest in stamping [child pornography] out without regard to ... its content.... The fact that a work contained serious literary, artistic, or other value [under *Miller's* obscenity standard] did not excuse the harm it caused to its child participants.").

*Ashcroft* addressed the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. § 2252 *et seq.*, which the Supreme Court described as "proscrib[ing] a significant universe of speech that is neither obscene under *Miller* nor child pornography under *Ferber*." *Ashcroft*, 535 U.S. at 240, 122 S.Ct. 1389. That "universe of speech" affected by the CPPA was "sexually explicit images that *appear* to depict minors but were produced *without* using *any real* children." *Id.* at 239, 122 S.Ct. 1389 (emphasis added). In other words, the CPPA outlawed "virtual" child pornography. *Id.* at 241, 122 S.Ct. 1389.

In *Ashcroft*, the Supreme Court held that the CPPA was an overbroad and unconstitutional abridgment of the freedom of speech. *Ashcroft*, 535 U.S. at 256, 122 S.Ct. 1389. The Supreme Court explained that the speech covered by the CPPA did not fall under *Ferber* because while *Ferber* addressed the prohibition of "images [that] are themselves the *product* of child sexual abuse," *id.* at 249, 122 S.Ct. 1389 (citing *Ferber*, 458 U.S. at 761, 102 S.Ct. 3348) (emphasis), the CPPA attempted to prohibit "speech that records no crime and creates no victims *by its production.*" *Id.* at 250, 122 S.Ct. 1389. Because in virtual child pornography—pornography depicting child sex but *not* involving *real* children— the "images do not involve, let alone harm, any children in the production process,"

the Supreme Court refused to ascribe to the CPPA *Ferber's* protection-of-children public policy exclusion from the First Amendment. *Id.* at 241, 122 S.Ct. 1389. In fact, the Supreme Court observed, "*Ferber* did not hold that child pornography is by definition without value ... but relied on virtual images—the very images prohibited by the CPPA—as an alternative and permissible means of expression." *Id.* at 251, 122 S.Ct. 1389 (citing *Ferber*, 458 U.S. at 761, 763, 102 S.Ct. 3348).

Because the CPPA was not protected under *Ferber*, for the statute to be constitutional the Supreme Court had to find either that virtual child pornography was *per se* obscene—and thus excluded from the First Amendment under *Miller*—or that, as suggested by the dissenting Court of Appeals Judge, "virtual child pornography should be regarded as an additional category of unprotected speech." *Ashcroft*, 535 U.S. at 246, 122 S.Ct. 1389. The Supreme Court refused to so find. Focusing on the CPPA's relationship with the obscenity doctrine developed under *Miller v. California*, the Court observed that:

> [T]he CPPA is much more than a supplement to the existing federal prohibition on obscenity.... The CPPA ... extends to images [of virtual child sex] without regard to the *Miller* requirements. The materials need not appeal to the prurient interest [under the CPPA]. Any depiction of sexually explicit activity [appearing to involve a minor], no matter how it is presented, is proscribed [by the CPPA].... It is not necessary, moreover, that the image be patently offensive [under the CPPA].... The CPPA prohibits speech despite its serious literary, artistic, political, or scientific value.... Under the CPPA, images are prohibited so long as the persons appear to be under 18 years of age.

*Id.* Because it did not conform with the legal and public policy underpinnings of the Supreme Court's obscenity doctrine— "because it lacks the required link between its prohibitions and the affront to community standards prohibited by the [*Miller*] definition of obscenity"—the Supreme Court found that "the CPPA cannot be read to prohibit obscenity" and thus was an unconstitutional abridgement of free speech. *Id.* at 249, 122 S.Ct. 1389. In support of its conclusion, and to exhibit the CPPA's constitutionally fatal overbreadth, the Supreme Court provided examples of both heralded and mundane works of scientific, literary, and artistic expression that would be punishable under the statute. *Id.* at 246–48, 122 S.Ct. 1389. (describing, *e.g.*, psychology manuals, modern renditions of Shakespeare's *Romeo and Juliet,* and Academy Award Best Picture winner *American Beauty* and nominee *Traffic* ). "The CPPA," the Supreme Court concluded, "is inconsistent with *Miller.*" *Id.* at 251, 122 S.Ct. 1389.

The Supreme Court's holding in *Ashcroft,* therefore, was that the CPPA— which criminalized any sexually explicit images appearing to involve a minor, or, in other words, virtual child pornography— exceeded the narrow exception to the First Amendment regarding pornography produced with real children described in *Ferber* and did not conform with the *Miller* standards allowing for the prohibition of obscenity. On these grounds, the Supreme Court invalidated the CPPA as overbroad and unconstitutional. Nowhere in *Ashcroft,* however, did the Supreme Court indicate, either expressly or impliedly, that an individual instance of virtual child pornography could not be deemed as obscenity under *Miller* and thus could not be subject to criminal prosecution. The statute was struck down; virtual child pornography's susceptibility to prosecution as obscenity was not. The Supreme Court indicated that virtual child pornography

could still be criminally liable under *Miller* by stating:

> [W]e may assume that the apparent age of persons engaged in sexual conduct is relevant to whether a depiction offends community standards. *Pictures of young children engaged in certain acts might be obscene* where similar depictions of adults, or perhaps even older adolescents, would not.

*Ashcroft,* 535 U.S. at 240, 122 S.Ct. 1389 (emphasis added). Additionally, the Supreme Court in *Ferber* provided its approbation of virtual child pornography only "if it were necessary for literary or artistic value"—a clear nod by the Supreme Court that a depiction of virtual child sex avoids obscenity prosecution only if it survives the third prong of *Miller* scrutiny—because the Supreme Court "consider[ed] it unlikely that visual depictions of children performing sexual acts or lewdly exhibiting their genitals would often constitute an important and necessary part of a literary performance or scientific or educational work." *Ferber,* 458 U.S. 747, 762–63, 102 S.Ct. 3348 (1982).

Based upon the clearly expressed position taken by the Supreme Court in *Ashcroft v. Free Speech Coalition* and *New York v. Ferber,* the argument that *Ashcroft,* with its grounding in *Ferber,* could be necessarily extended to exonerate Defendant, who is charged with transporting obscene fictional writings describing child sex, is erroneous. *Ashcroft* found unconstitutional a statute criminalizing all depictions of child sex even if actual children were not involved in their production. *Ashcroft* did not find unconstitutional, however, the prosecution of virtual child pornography if the depiction is deemed obscene. If *Ashcroft* does not protect obscene *virtual images* of child sex from criminal liability, then it cannot protect obscene *fictional writings* of child sex

from prosecution. Obscenity and *Miller* come to the foreground under the facts of Defendant's case; child pornography, *Ferber*, and *Ashcroft* fade into the background, their only relation to this case being the Supreme Court's allowance "that the apparent age of persons engaged in sexual conduct is relevant to whether a depiction offends community standards [under *Miller*]," *Ashcroft*, 535 U.S. at 240, 122 S.Ct. 1389, and observation that "[w]e consider it unlikely that visual depictions of children performing sexual acts or lewdly exhibiting their genitals would often constitute an important and necessary part of a literary performance." *Ferber*, 458 U.S. at 762, 102 S.Ct. 3348.

Because Defendant's is an obscenity case, rather than a child pornography case, *Miller* and its progeny control. *Miller* was the Supreme Court's effort to "define the standards which must be used to identify obscene material ... without infringing on the First Amendment." *Miller v. California*, 413 U.S. 15, 20, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Obscenity, the Supreme Court explained, is "utterly without redeeming social importance" and is thus " 'not within the area of constitutionally protected speech or press.' " *Id.* at 20–21, 93 S.Ct. 2607 (quoting *Roth v. United States*, 354 U.S. 476, 484–85, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). In other words, "obscene material is unprotected by the First Amendment." *Id.* at 23, 93 S.Ct. 2607. Recognizing that the First Amendment "protects works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent," the Supreme Court nevertheless observed that "the public portrayal of hard-core sexual conduct for its own sake, and for the ensuing commercial gain, is a different matter." *Id.* at 34–35, 93 S.Ct. 2607.

The *Miller* Supreme Court formulated a three-factor test for a trier of fact to determine whether an expression of speech is an obscenity and thus excluded from First Amendment protection. The three *Miller* factors are:

(1) Whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

(2) Whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(3) Whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24, 93 S.Ct. 2607. The Supreme Court further defined its obscenity test by stating that "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed." *Id.* at 27, 93 S.Ct. 2607.

In two cases decided on the same day as *Miller*, the Supreme Court expanded its obscenity jurisprudence in ways relevant to Defendant's case. First, in *Kaplan v. California*, the Supreme Court affirmed that "expression by words alone can be legally 'obscene' in the sense of being unprotected by the First Amendment." *Kaplan v. California*, 413 U.S. 115, 118, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). And second, in *United States v. Orito*, the Supreme Court affirmed the constitutionality of 18 U.S.C. § 1462, the statute under which Defendant is charged, in the face of a privacy challenge. *United States v. Orito*, 413 U.S. 139, 140–45, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973).

The first factor of the *Miller* test expressly applies "contemporary community

standards." *Miller,* 413 U.S. at 24, 93 S.Ct. 2607. Later Supreme Court cases ascribe the same contemporary community standard to the second factor of the *Miller* test. *See, e.g., Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 873, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("[T]he 'patently offensive' ... criteria ... is ... judged by contemporary community standards."); *Smith v. United States,* 431 U.S. 291, 301, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) ("[T]he jury must measure patent offensiveness against contemporary community standards."). The third *Miller* factor, however, "is not judged by contemporary community standards." *Reno,* 521 U.S. at 873, 117 S.Ct. 2329. In light of *Miller's* application of contemporary community standards to obscenity cases, the Eleventh Circuit has stated that "it is logical to try a defendant (in a federal obscenity case) in the district to which he allegedly mailed obscene materials" because "it is the district of receipt that suffers the brunt of the harms associated with the distribution of pornography and is most in need of protecting itself by the application of its community standards to the material in question." *United States v. Bagnell,* 679 F.2d 826, 832 (11th Cir.1982); *see also Ashcroft v. Am. Civil Liberties Union,* 535 U.S. 564, 583, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) ("If a publisher chooses to send its material into a particular community, this Court's jurisprudence teaches that it is the publisher's responsibility to abide by that community's standards.").

The Grand Jury of the Middle District of Georgia returned an Indictment against Defendant alleging that Defendant violated 18 U.S.C. § 1462 by transporting obscene material into the Middle District of Georgia. (Doc. 1). To return such an Indictment, the Grand Jury presumably [8] ap-

plied the Supreme Court's obscenity doctrine to the allegedly obscene material presented, particularly *Miller's* three-factor test. And to make such an application of *Miller,* the Grand Jury surely applied the contemporary community standards of the Middle District of Georgia to the allegedly obscene material, because the Middle District of Georgia is the district in which the allegedly obscene material was received. Nothing more was required for the Grand Jury to make a finding of probable cause. *See United States v. Williams,* 504 U.S. 36, 53, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (stating that a grand jury need "hear no more evidence than that which suffices to convince it an indictment is proper").

Because the District of Minnesota Orders were expressly "applying contemporary Minnesota standards" (Doc. 34–2 at 4) in their decisions to deny the Government's search warrant application, the District of Minnesota Orders had no relevance to the Middle District of Georgia Grand Jury's deliberations. "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City." *Miller v. California,* 413 U.S. 15, 32, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Likewise, contemporary community standards in Minnesota may not be equivalent to those in the Middle District of Georgia, and therefore have no bearing upon a Middle District of Georgia Grand Jury's application of its community standards to the allegedly obscene materials presented for its consideration. In fact, to thrust the District of Minnesota Orders upon the Middle District of Georgia Grand Jury would destroy

---

8. The Court notes that a presumption of regularity attaches to Grand Jury proceedings. *United States v. R. Enterprises, Inc.,* 498 U.S. 292, 300–01, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991).

the very independence of the Grand Jury that Defendant is ostensibly arguing to protect: the Grand Jury could be influenced by the Minnesota standards in such a way as to misapply those of its own district. Such an affront to *Miller*, as well as to "[t]he necessity to society of an independent and informed grand jury," *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), would be constitutionally intolerable.

Assuming that the Grand Jury was never presented with the District of Minnesota Orders—the Government has made no indication as to whether they were—the Government committed no prosecutorial misconduct in omitting the irrelevant Orders from the Grand Jury presentation. There was no "material omission," because the District of Minnesota Orders, applying Minnesota contemporary community standards, were not material to the deliberations of the Middle District of Georgia Grand Jury. In evaluating Defendant's allegations, the Court finds that the Grand Jury process in this case did not contain abuse or infirmities that deprived the Grand Jury of its constitutional function or Defendant of his constitutional rights. The Court finds no "prosecutorial misconduct . . . prejudicial to the defendant," nor detects any violation that "substantially influenced the grand jury's decision to indict," nor harbors any " 'grave doubt' that the decision to indict was free from the substantial influence of" any violations. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–56, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Therefore, the Court "may not dismiss an indictment for errors in grand jury proceedings." *Id.* at 254, 108 S.Ct. 2369.

For the foregoing reasons, Defendant's Motion to Dismiss Indictment on Grounds of Government Misconduct Before the Grand Jury (Doc. 50) is **DENIED.**

## V. DEFENDANT'S MOTION TO UN-SEAL TRANSCRIPTS OF GRAND JURY PROCEEDINGS (Doc. 41)

Defendant's Motion to Unseal Transcripts of Grand Jury Proceedings (Doc. 41) requests that the Court unseal the Grand Jury transcripts relevant to this case or, in the alternative, to permit *in camera* review of the Grand Jury transcripts. (Doc. 41 at 1). Defendant bases his Motion on the suspected failure by the Government to produce the aforementioned District of Minnesota Orders to the Grand Jury. (Doc. 41 at 5). This Court has already found, *supra*, that the District of Minnesota Orders had no relevance to, and their absence did not threaten the constitutionality of, the Middle District of Georgia Grand Jury's deliberations in this case, and therefore denied Defendant's Motion to Dismiss Indictment on Grounds of Government Misconduct Before the Grand Jury (Doc. 50). Because Defendant has not shown that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury, Fed. R.Crim.P. 6(e)(3)(E)(ii), Defendant's Motion to Unseal Transcripts of Grand Jury Proceedings (Doc. 41) is **DENIED.**

## VI. DEFENDANT'S MOTION TO DIS-MISS THE INDICTMENT FOR FAILURE TO STATE AN OF-FENSE (Doc. 70)

Defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 70) was fifty-seven (57) pages long. (*See* Doc. 70). As Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense explains, the Court's Order of December 12, 2008 set the page limitation at thirty-five (35) pages. (Doc. 72 at 1). Pursuant to the Court's December 12, 2008 Order, Defendant filed his Amended Motion to Dismiss the Indictment for Failure to State an

Offense (Doc. 72). Accordingly, Defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 70) is **DENIED as moot.**

## VII. DEFENDANT'S AMENDED MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE (Doc. 72)

Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72) asserts six distinct grounds on which he maintains that the conduct charged in the Indictment is incapable of constituting a violation under 18 U.S.C. § 1462. Defendant summarizes the six grounds as follows:

> (1) the statute does not reach this sort of conduct; (2) if Congress intended the statute to reach this sort of conduct, then § 1462 is an *ex post facto* law, by the same token, if judicial construction is required to allow the statute to reach this conduct, then the notice requirement of the Due Process Clause is offended; also, under any construction of the statute that would encompass this conduct, it would be rendered overly (3) vague and (4) broad, and would (5) "chill" a substantial range of protected speech; and, in any event, (6) fictional

ideas that are not distributed to unwilling recipients are protected speech.

(Doc. 72 at 33). For the following reasons, Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72) is **DENIED.**[9]

### A. 18 U.S.C. § 1462's Reach to Defendant's Conduct

#### 1. Parties' Arguments

Defendant's Motion argues that "nowhere in the 143–year history of reported cases interpreting the prohibition contained in § 1462 (or its marginally similar predecessors) has it been held that conduct of [Defendant's] sort is even able to be regulated, let alone criminally punished (i.e., no harm flowed from this conduct, no nuisance was created, the government want[s] to punish thought)." (Doc. 72 at 1 to 2). Following an ostensibly comprehensive[10] survey of the history of federal obscenity jurisprudence—including discussion of the Supreme Court's decisions in *United States v. Alpers,*[11] *Roth v. United States,*[12] *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney Gen. of Mass.,*[13] *Ginzburg v. United States,*[14] *Interstate Circuit, Inc. v. City of Dallas,*[15] *Stanley v. Georgia,*[16] *United States v. Reidel,*[17] *Miller v. California,*[18] *Paris Adult Theatre I v. Slaton,*[19] *United*

---

**9.** Because the Parties' arguments at the oral hearing did not diverge from the arguments presented in their briefs, the Court will not address oral argument in the discussion below. (*See* Doc. 111 at 74 to 101).

**10.** See *infra* discussion of *Kaplan v. California,* 413 U.S. 115, 118, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973).

**11.** 338 U.S. 680, 70 S.Ct. 352, 94 L.Ed. 457 (1950).

**12.** 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

**13.** 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

**14.** 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).

**15.** 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968).

**16.** 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

**17.** 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971).

**18.** 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

**19.** 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).

*States v. 12 200–Ft. Reels of Super 8mm Film,*[20] *United States v. Orito,*[21] *Hamling v. United States,*[22] *Marks v. United States,*[23] *Smith v. United States,*[24] *Pinkus v. United States,*[25] *Walter v. United States,*[26] *New York v. Ferber,*[27] and *Ashcroft v. Free Speech Coalition*[28] (*see* Doc. 72 at 4 to 27)—Defendant observes that "virtually all cases interpreting this ban [on obscenity] ... are public nuisance cases—cases where there was some injury to the 'community' to whose after-the-fact determination a work would be subjected in derogation of 'fair warning' principles." (Doc. 72 at 28). Based upon this observation, Defendant argues that "no nuisance was created to the public or any member thereof" by his charged conduct, which was "nothing more than the private communication of the location of [Defendant's] works of literary fiction directly to an interested reader," and therefore that the Indictment "amounts to nothing less than a campaign to imprison him because the nature of the fictional stories are found distasteful; i.e., to punish his thoughts." (*Id.*). Additionally, attacking the Commerce Clause reach of 18 U.S.C. § 1462 to Defendant's charged conduct, Defendant argues that "there is no allegation [that], nor did [Defendant], engage in any sort of commercial activity, which may give rise to the much more attenuated basis that has been asserted to justify federal criminal regulation of the fictional speech here."

(*Id.*). Defendant concludes that "if there is no nuisance element, and not even a commercial dimension to the conduct[,] what concern of the public is implicated that would justify this criminal prosecution for the private communication [of] thoughts? The statute ... cannot be construed to cover [Defendant's] conduct." (Doc. 72 at 29).

The Government's Response (Doc. 75) asserts that "the Supreme Court has consistently held [that] obscenity trafficked in interstate commerce, as opposed to obscenity privately used within the home, may be subject to federal regulation" and therefore that "[a] simple reading of the statute and the Indictment makes plain that Defendant's characterization is erroneous and his conduct comes within the ambit of the statute." (Doc. 75 at 3). The Government then provides an historical survey of Supreme Court obscenity decisions, beginning with *Roth v. United States* for the "axiomatic proposition that obscenity is not constitutionally protected speech," followed by an observation that while "[i]n *Stanley [v. Georgia]*, the Court held that the Government may not constitutionally criminalize the simple possession of obscenity in one's home," the Supreme Court in a series of decisions post-*Stanley* "has emphatically rejected the argument that any privacy right recognized in *Stanley* implies some correlative constitutional right to receive or distribute obscene ma-

**20.** 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

**21.** 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973).

**22.** 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

**23.** 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

**24.** 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977).

**25.** 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978).

**26.** 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).

**27.** 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

**28.** 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).

terial for use in the home." (Doc. 75 at 3 to 5; *see also* Doc. 75 at 5 to 8 (discussing Supreme Court's treatment of privacy in *United States v. Thirty–Seven Photographs*,[29] *Reidel*, and *Orito* )). The Government cites a recent Fourth Circuit decision upholding a § 1462 conviction for sending and receiving obscene text messages for the opinion's holding that "§ 1462 falls outside the narrow holding [of] *Stanley*." (Doc. 75 at 8 (citing *United States v. Whorley*, 550 F.3d 326 (4th Cir. 2008))). After quoting the instant Indictment, the Government concludes that "contrary to Defendant's assertion, the Indictment does not simply charge him with writing obscene stories in the privacy of his home, such that he can claim shelter under the privacy exception articulated in *Stanley*.... Defendant may be subject to criminal prosecution under §§ 1462 and 2 for *transporting* obscene material in interstate and foreign commerce irrespective of the fact that he created the obscene material on one or more computers located ... in his home." (Doc. 75 at 9 to 10 (emphasis Government's)).

Defendant's Reply (Doc. 78) objects to the Government's having "translated" his argument into "a *Stanley*-based correlative rights argument (something to the effect that since 'obscene' material is protected in the home, a correlative right exists to take it with you where you go)" because "no such claim was presented" in Defendant's Motion. (Doc. 78 at 1 to 2). Rather, Defendant asserts, he "demonstrated that a nuisance element is necessary (or at the very least, a commercial dimension to the conduct) for federal criminal power to arise in an obscenity prosecution of this sort, and for communication of *fictional ideas* to be criminally punishable." (Doc. 78 at 2 (emphasis Defendant's)). Observing that the Government's Response did not address Defendant's Motion's question

of "what then is the basis of the instant prosecution?," Defendant argues that "if simple suppression of speech requires a 'compelling public interest', [sic] then *certainly*, [sic] criminal liability for fictional stories written and communicated to the interested reader should only arise on the shoulders of the most compelling of public interests" and that Defendant's "conduct cannot be construed to be covered under this statute—it amounts only to the communication of one man's thoughts to another." (Doc. 78 at 2 (emphasis Defendant's)). Defendant concludes with the hypothetical assertion that "if [Defendant] had communicated the same exact thoughts to a psychotherapist, a relative, a priest, or some other confidant, over the telephone or via some other medium of communication, his liability would be the same ... such that the participants could be convicted and imprisoned for the non-public communication of *thought*. Why? What interest or need of the public could possibly countenance such a regime?" (Doc. 78 at 3 (emphasis Defendant's)).

### 2. Court's Analysis and Conclusion

██ Despite Defendant's Motion's clear attack against two facets of 18 U.S.C. § 1462's constitutional nexus to his charged conduct—that he created no public nuisance and that his was not a commercial endeavor—the Government's Response focuses almost exclusively upon the issue of privacy. (*Compare* Doc. 72 at 28 to 29 *with* Doc. 75 at 3 to 10). The Government's misplaced and myopic exploration of *Stanley v. Georgia* and similar cases addresses neither public nuisance nor commercial conduct issues in the context of obscenity, a deficiency that Defendant's Reply correctly observes. (*See* Doc. 78 at 1 to 2). The Government's failure to appropriately respond to the issues raised in Defendant's Motion leaves the Court in

---

**29.** 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

an untenable position: deciding a dispositive motion without the benefit of properly developed argument from both sides. While this scenario offers the Court the opportunity to accept outright Defendant's uncontroverted position, the Court cannot do so in light of the clear law opposing Defendant's standpoint. Were the law not so decidedly favorable to the Government, however, the Court might have taken the Government's silence as acquiescence and, consequently, dismissed.

The relevant text of 18 U.S.C. § 1462 reads: "Whoever ... knowingly uses any ... interactive computer service ... for carriage in interstate or foreign commerce—(a) any obscene, lewd, lascivious, or filthy ... writing ... or other matter of indecent character; ...—Shall be fined under this title or imprisoned...." 18 U.S.C. § 1462. Two questions relating to this excerpt of 18 U.S.C. § 1462 are raised by Defendant's Motion. First, whether his conduct occurred "in interstate or foreign commerce." (*See* Doc. 72 at 28 to 29; Doc. 78 at 1 to 3). Second, whether an "obscene ... writing" must also be a public nuisance in order to be punishable. (*See* Doc. 72 at 1 to 29; Doc. 78 at 1 to 3). The Court will address each in turn.

The Commerce Clause gives Congress the authority "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8. The Supreme Court has identified "three general categories of regulation in which Congress is authorized to engage under its commerce power." *Gonzales v. Raich*, 545 U.S. 1, 16, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). Those three categories are:

> First, Congress can regulate the channels of interstate commerce.... Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce.... Third, Congress has the power to regulate activi-

ties that substantially affect interstate commerce.

*Id.* at 16–17, 125 S.Ct. 2195 (citing *Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)) (citations omitted). Because it is unclear whether Defendant is asserting a facial challenge or an as-applied challenge to the Commerce Clause's applicability to his case, the Court will address both types of challenges.

■ While the first *Raich* category is inapplicable to 18 U.S.C. § 1462, the second category is clearly applicable. By its express language, the statute prohibits the "carriage" of "obscene ... writing" in "interstate ... commerce" via an "interactive computer service." 18 U.S.C. § 1462. The statute, therefore, is "tether[ed] ... to interstate commerce" by "an express jurisdictional hook." *United States v. Peters*, 403 F.3d 1263, 1272 (11th Cir.2005) (citing *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)). As Eleventh Circuit precedent states, the Internet "is an instrumentality of interstate commerce" and "Congress clearly has the power to regulate the internet, as it does other instrumentalities and channels of interstate commerce, and to prohibit its use for harmful or immoral purposes." *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir.2004). The Indictment charges Defendant with allegedly transmitting, or aiding and abetting in the transmission of, obscene writings that were downloaded via the Internet into the Middle District of Georgia. (Doc. 1 at 1 to 2). Because Defendant's alleged conduct occurred on the Internet, which is a channel of interstate commerce subject to Congressional regulation, and because the statute under which Defendant is charged contains an "explicit jurisdictional hook[ ] to ensure that [it] capture[s] only conduct substantially affecting commerce," *Peters*, 403 F.3d at 1273, the Commerce Clause prop-

erly reaches Defendant. *See United States v. Orito*, 413 U.S. 139, 143, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973) ("[T]he Government has a legitimate interest in protecting the public commercial environment by preventing [obscene] material from entering the stream of commerce."). The statute thus withstands Defendant's facial challenge.

The statute similarly withstands Defendant's as-applied challenge, which contends that because his was not a commercial endeavor it therefore was not "in interstate ... commerce." (Doc. 72 at 28). As stated above, the third *Raich* category is Congress's regulation of activities that "substantially affect interstate commerce." *Raich*, 545 U.S. at 17, 125 S.Ct. 2195. The classic Supreme Court decision of *Wickard v. Filburn* "establishe[d] that Congress can regulate purely intrastate activity *that is not itself 'commercial,' in that it is not produced for sale,* if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Raich*, 545 U.S. at 18, 125 S.Ct. 2195 (discussing *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)) (emphasis added). In *Raich*, the Supreme Court found that "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would ... affect price and market conditions" just as the *Wickard* Court "had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions." *Id.* at 19, 125 S.Ct. 2195; *see id.* at 22, 125 S.Ct. 2195 ("In assessing the scope of Congress' authority under the Commerce Clause, ... [w]e need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so con-

cluding."). The *Raich* Court also found that "the diversion of homegrown marijuana tends to frustrate the federal interest in eliminating commercial transactions in the interstate [marijuana] market in their entirety" and thus "the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity." *Id.*

The Eleventh Circuit summarized this aspect of *Raich* to mean that "where Congress comprehensively regulates economic activity, it may constitutionally regulate intrastate activity, *whether economic or not,* so long as the inability to do so would undermine Congress's ability to implement effectively the overlying economic regulatory scheme." *United States v. Maxwell*, 446 F.3d 1210, 1215 (11th Cir.2006) (emphasis added). In *Maxwell*, the defendant's conviction under 18 U.S.C. § 2252A(a)(5)(B) for possession of child pornography was upheld by the Eleventh Circuit on the realization that "much of the [*Raich*] Court's analysis could serve as an opinion in this case by simply replacing marijuana ... with child pornography." *Id.* at 1216. After observing Congress's statement that "'child pornography ... ha[s] become [a] highly organized, multimillion dollar industr[y] that operate[s] on a nationwide scale,'" *id.* at 1217 (quoting S.Rep. No. 95–438, at 5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 42, 1977 WL 9660) (alterations in original), the Eleventh Circuit concluded that:

> [I]t [is not] irrational for Congress to conclude that its inability to regulate the intrastate incidence of child pornography would undermine its broader regulatory scheme designed to eliminate the market in its entirety, or that "the enforcement difficulties that attend distinguishing between [purely intrastate and

interstate child pornography]" . . . would frustrate Congress's interest in completely eliminating the interstate market. It is well within Congress's authority to regulate directly the commercial activities constituting the interstate market for child pornography, and "[p]rohibiting the intrastate possession . . . of an article of commerce is a rational . . . means of regulating commerce in that product."

*Id.* at 1218 (quoting *Raich,* 545 U.S. at 22, 26, 125 S.Ct. 2195) (citation omitted) (alterations in original). A later Eleventh Circuit opinion affirming a conviction under 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B) found that "Congress could have rationally concluded that the inability to regulate intrastate possession and production of child pornography would, in the aggregate, undermine Congress's regulation of the interstate child pornography market." *United States v. Smith,* 459 F.3d 1276, 1285 (11th Cir.2006).

█ Little differentiates the Commerce Clause conclusions reached in the *Maxwell* and *Smith* child pornography opinions from the as-applied Commerce Clause challenge raised by Defendant in his obscenity prosecution. Congress has recognized "an estimated billion-dollar business in obscenity." Commission on Obscenity and Pornography, H.R.Rep. No. 90–521 (1967), *reprinted in* 1967 U.S.C.C.A.N. 1632, 1633, 1967 WL 4057. Congress, through its comprehensive regulation of which 18 U.S.C. § 1462 is a component, has attempted to eliminate the entire market for obscenity, which, as the Supreme Court noted in *Raich,* is just as valid an exercise of Commerce Clause authority as price and volume controls of an otherwise legal market. *See Maxwell,* 446 F.3d at 1217. And because Congress could have rationally concluded that the inability to regulate noncommercial interstate transportation of obscenity would, in the aggregate, undermine Congress's regulation of the interstate obscenity market, *see Smith,* 459 F.3d at 1285, the application of 18 U.S.C. § 1462 to Defendant's charged conduct "is squarely within Congress' commerce power." *Raich,* 545 U.S. at 19, 125 S.Ct. 2195. Defendant's as—applied challenge therefore fails.

█ With the Commerce Clause issue fully dispensed, the Court turns to the second question: whether an "obscene . . . writing" must also be a public nuisance in order to be punishable. The Court finds that no such "public nuisance" requirement exists. As the history of obscenity jurisprudence shows, the federal obscenity statutes are aimed at protecting society's morals from the corruptive influence of obscene matter, and thus delve deeper than merely prohibiting the public display of obscenity. While Supreme Court precedent shows that the private possession of obscenity in one's home is narrowly protected, once taken outside the home obscene materials are subject to broad regulation and prosecution. The obscenity statute properly reaches Defendant's alleged conduct.

More than a century ago, the Supreme Court stated that a precursor to 18 U.S.C. § 1462, whose purpose was "excluding various articles from the mail" including any "obscene, lewd, or lascivious book, pamphlet, picture, paper, print, or other publication of an indecent character," did so "to refuse its facilities for the distribution of matter deemed injurious to the *public morals.* . . . All that Congress meant by this act was, that the mail should not be used to transport such *corrupting* publications and articles, and that any one who attempted to use it for that purpose should be punished." *Ex parte Jackson,* 96 U.S. 727, 736, 24 L.Ed. 877 (1877) (emphasis added). Seventy-three years later, the Supreme Court held that 18 U.S.C. § 1462's "obvious purpose . . . was to prevent the

channels of interstate commerce from being used to disseminate any matter that, in its essential nature, communicates obscene, lewd, lascivious or filthy *ideas.*" *United States v. Alpers,* 338 U.S. 680, 683, 70 S.Ct. 352, 94 L.Ed. 457 (1950) (emphasis added). Shortly thereafter came the seminal obscenity case of *Roth v. United States,* in which the Supreme Court found that "implicit in the history of the First Amendment is the rejection of obscenity as *utterly without redeeming social importance.*" *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (emphasis added). In support, the *Roth* Court quoted an older case for the proposition that "lewd and obscene … utterances are no essential part of any exposition of *ideas,* and are of such *slight social value* as a step to truth that any benefit that may be derived from them is *clearly outweighed by the social interest in order and morality.*" *Id.* at 485, 77 S.Ct. 1304 (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)) (emphasis added); *see also New York v. Ferber,* 458 U.S. 747, 754, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (describing the above-quoted *Chaplinsky* excerpt as "the foundation for the excision of obscenity from the realm of constitutionally protected expression"). And the *Roth* Court rejected arguments "insist[ing] that the constitutional guarantees are violated because convictions may be had without proof either that obscene material will perceptibly create *a clear and present danger of antisocial conduct,* or will probably induce its recipients to such conduct." *Id.* at 486, 77 S.Ct. 1304 (footnote omitted) (emphasis added); *see Stanley v. Georgia,* 394 U.S. 557, 567, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (acknowledging rejection).

According to the Supreme Court's interpretation well into the mid–1900s, then, the obscenity statutes were not aimed at merely preventing "antisocial conduct."

*Roth,* 354 U.S. at 486, 77 S.Ct. 1304. Rather, obscenity legislation was Congress's valid attempt at protecting the "public morals" from the "corrupting" influence of obscene matter, which consists of "ideas" that are "utterly without redeeming social importance." *Jackson,* 96 U.S at 736; *Alpers,* 338 U.S. at 683, 70 S.Ct. 352; *Roth,* 354 U.S. at 484, 77 S.Ct. 1304. While "[a]ll ideas having even the slightest redeeming social importance" basked in the full protection of the First Amendment, *Roth,* 354 U.S. at 484, 77 S.Ct. 1304, obscenity was left out in the cold.

In *Stanley v. Georgia,* the Supreme Court addressed the conflict between society's effort to purge itself of obscenity and an individual's fundamental privacy right to possess obscenity in the home. While championing the right of privacy in this particular conflict—"the mere private possession of obscene matter cannot constitutionally be made a crime," *Stanley v. Georgia,* 394 U.S. 557, 559, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)—the Supreme Court nevertheless recognized "the power of the state to control public dissemination of ideas inimical to the public morality." *Id.* at 566, 89 S.Ct. 1243. In describing the limitation of its holding, the *Stanley* Court stated that "the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home." *Id.* at 568, 89 S.Ct. 1243. Just two years later, to show that *Stanley* protected only the possession of obscenity in the home and nothing more, the Supreme Court held that obscenity distributors "have no claim, and could make none, about unwanted governmental intrusions into the privacy of their home" because "*Roth* has squarely placed obscenity and its distribution outside the reach of the First Amendment and they remain there." *United States v. Reidel,* 402 U.S. 351, 355–56, 91 S.Ct. 1410,

28 L.Ed.2d 813 (1971); *see also United States v. 12 200–ft. Reels of Super 8mm. Film,* 413 U.S. 123, 126, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973) ("*Stanley* depended, not on any First Amendment right to purchase or possess obscene materials, but on the right to privacy in the home."); *United States v. Thirty–Seven (37) Photographs,* 402 U.S. 363, 376, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) ("That the private user under *Stanley* may not be prosecuted for possession of obscenity in his home does not mean that he is entitled to import it from abroad free from the power of Congress to exclude noxious articles from commerce. *Stanley's* emphasis was on the freedom of thought and mind in the privacy of the home. But a port of entry is not a traveler's home."); *Smith v. United States,* 431 U.S. 291, 307, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) ("[T]he individual's right to possess obscene material in the privacy of his home ... did not create a correlative right to receive, transport, or distribute the material."). *Stanley* did not say that obscenity is no longer obscenity once it enters the home; rather, *Stanley* held that, once in the home, the individual's right of privacy outweighed the countervailing societal interest in regulating obscene matter.

The landmark case of *Miller v. California* was couched in the context of "the application of a State's criminal obscenity statute to a situation in which sexually explicit materials have been thrust by aggressive sales action upon unwilling recipients who had in no way indicated any desire to receive such materials." *Miller v. California,* 413 U.S. 15, 18, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). But obscenity jurisprudence was not pigeonholed by the public nuisance context of *Miller.* For while on the one hand the Supreme Court "recognized that the States have a legitimate interest in prohibiting dissemination or exhibition of obscene material when the mode of dissemination carries with it a significant danger of offending the sensibilities of unwilling recipients or of exposure to juveniles," *id.* at 18–19, 93 S.Ct. 2607, on the other hand the Supreme Court did not say that such was the *only* governmental interest regarding obscenity. Indeed, on the same day as *Miller,* the Supreme Court stated that:

> Although we have often pointedly recognized the high importance of the state interest in regulating the exposure of obscene materials to juveniles and unconsenting adults ... this Court has never declared these to be the only legitimate state interests permitting regulation of obscene material.... [W]e hold that there are legitimate state interests at stake in stemming the tide of commercialized obscenity ... includ[ing] the interest of the public in the quality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself.

*Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 57–58, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (citations omitted). In a separate obscenity opinion on the same day, the Supreme Court furthermore stated that because "the Government has a legitimate interest in protecting the public commercial environment by preventing [obscene] material from entering the stream of commerce ... we cannot say that the Constitution forbids comprehensive federal regulation of interstate transportation of obscene material merely because such transport may be by private carriage, or because the material is intended for the private use of the transporter." *United States v. Orito,* 413 U.S. 139, 143, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973). And also on that same day in 1973 the Supreme Court refused "to permit importation of admittedly obscene materials simply because it is imported for private use only" because "[t]o allow such a claim

would be not unlike compelling the Government to permit importation of prohibited or controlled drugs for private consumption as long as such drugs are not for public distribution or sale." *United States v. 12 200-ft. Reels of Super 8mm. Film,* 413 U.S. 123, 128, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *see Miller,* 413 U.S. at 36, 93 S.Ct. 2607 (observing similarly that "civilized people do not allow unregulated access to heroin because it is a derivative of medicinal morphine"). Were public nuisance a requirement of obscenity doctrine, then the Supreme Court's holdings in *Slaton, Orito,* and *12 200-ft. Reels of Super 8mm. Film* would have stated that the private possession of obscene materials in interstate or foreign commerce and intended for only private use was protected for failure to pose a public nuisance. The Supreme Court did not so hold, and thus public nuisance is not so required in an obscenity prosecution. None of the other cases cited in Defendant's historical survey of obscenity jurisprudence, nor any other Supreme Court obscenity opinions encountered in the Court's research, suggest otherwise.

Defendant argues that his non-commercial endeavor excludes him from the Commerce Clause, and that because his activity did not pose a public nuisance he is exempt from an obscenity prosecution. Supreme Court precedent, however, clearly does not support his argument. For the reasons stated above, the Court finds that the Commerce Clause properly reaches Defendant's charged conduct and that an obscenity prosecution does not require a public nuisance element.

**B. 18 U.S.C. § 1462's Status as an Ex Post Facto Law and Sufficiency of Constitutional Notice**

**1. Parties' Arguments**

Defendant's Motion argues that "the statute lacks the 'fair warning' element." (Doc. 72 at 2). Furthering this argument,

Defendant states in a footnote that "if the statute was intended by Congress to reach [Defendant's] sort of conduct, then it would be an *ex post facto* law" and "if such was not the intent of Congress, then any judicial construction of the statute that encompasses this conduct would run afoul of the notice requirements of the Due Process Clause of the Fifth Amendment." (Doc. 72 at 2 n. 2; *see also* Doc. 72 at 29).

The Government's Response states that Defendant's arguments are meritless for three reasons: (1) "Defendant had fair warning because the statute itself alerts one to the possibility of prosecution"; (2) "Defendant ... made several admissions regarding the criminal nature of his conduct, the possibility of prosecution for his conduct, and his awareness of a recent prosecution for similar criminal conduct"; and (3) "prosecution under the statute does not require a prior finding of obscenity which is a fact question for the jury, or violate ex post fact [sic] law because the charged conduct substantially post-dates the creation of the *Miller* obscenity test." (Doc. 75 at 10 to 11; *see also* Doc. 75 at 11 to 15).

Defendant's Reply contends that because his was "speech from which no nuisance flowed, and conduct which was non-commercial in nature," it would be violative for him to be "subject to punishment for an enormous range of conduct that was neither (strictly speaking) illegal at the time it was committed, nor could a reasonable person have known they were committing a crime." (Doc. 78 at 4 to 5).

**2. Court's Analysis and Conclusion**

■ The Ex Post Facto Clause is based upon "the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties" and "is fundamental to our concept of constitutional liberty." *Marks v. United States,* 430 U.S. 188, 191, 97 S.Ct. 990, 51 L.Ed.2d 260

(1977) (citing *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)). Defendant's distinction between the Ex Post Facto Clause and Fifth Amendment Due Process is well-founded, for "[t]he Ex Post Facto Clause is a limitation upon the powers of the Legislature ... and does not of its own force apply to the Judicial Branch." *Id.* (citation omitted). "As such, that right [to fair warning] is protected against judicial action by the Due Process Clause of the Fifth Amendment." *Id.* The Supreme Court has "taken special care to insist on fair warning when a statute regulates expression and implicates First Amendment values." *Id.* at 196, 97 S.Ct. 990.

▮ The Court, taking all due care, finds that Defendant had fair warning that his charged conduct could give rise to criminal penalties sufficient to satisfy the Ex Post Facto Clause and Fifth Amendment Due Process. *Miller v. California*, with its accepted test for obscenity, was decided in 1973. Defendant's charged conduct allegedly began in 2002. (Doc. 1 at 1). Thus, the standard for the type of "obscene ... writing" that could face criminal prosecution under 18 U.S.C. § 1462 had been in existence for at least 29 years prior to Defendant's charged conduct. This is not an instance, such as that encountered by the Supreme Court in *Marks v. United States*, in which the charged conduct occurred prior to the standards established in *Miller*. *See Marks v. United States*, 430 U.S. 188, 196, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). The Supreme Court in *Miller*, moreover, expressly stated that the opinion's "specific prerequisites will provide *fair notice* to a dealer in such materials that his public and commercial activities may bring prosecution." *Miller v. California*, 413 U.S. 15, 27, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (emphasis added). Furthermore, this Court's previous analysis, *supra*, regarding the Commerce Clause and public nuisance doctrine as it

relates to Defendant shows conclusively that both the non-commercial nature of and lack of public nuisance in Defendant's charged conduct does nothing to defeat his criminal liability. Such has been the case regarding the Commerce Clause since at least 1942, when the Supreme Court decided *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and regarding public nuisance since at least 1877 when the Supreme Court decided *Ex parte Jackson*, 96 U.S. 727, 24 L.Ed. 877 (1877). Finally, Defendant's grand historical survey of Supreme Court obscenity jurisprudence (*see* Doc. 72 at 4 to 27) glaringly omits an opinion released on the same day as *Miller* that is extremely relevant to Defendant's case. *Kaplan v. California* contains the Supreme Court's affirmation that "expression by words alone can be legally 'obscene' in the sense of being unprotected by the First Amendment." *Kaplan v. California*, 413 U.S. 115, 118, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). The *Kaplan* Court upheld the defendant's conviction for violating a California obscenity statute on a finding that a non-illustrated fictional book entitled "Suite 69," which was "made up entirely of repetitive descriptions of physical, sexual conduct, 'clinically' explicit and offensive to the point of being nauseous" with "only the most tenuous 'plot,'" was "not protected by the First Amendment." *Id.* at 116–18, 93 S.Ct. 2680. The Court, being familiar with Defendant's stories, observes that a jury could equate his works with the *Kaplan* book. In summary, based upon the reasons stated, Defendant here had fair warning.

## C. 18 U.S.C. § 1462's Constitutional Vagueness

### 1. Parties' Arguments

Defendant's Motion argues that "if § 1462 was construed to encompass a prohibition of [Defendant's] charged conduct

..., the statute would be rendered unconstitutionally vague, subjecting an impermissibly wide range of speech and conduct to an unascertainable standard." (Doc. 72 at 2). Defendant argues that "if the private communications of willing participants is to be subjected to federal criminal liability based on the content of those communications (specifically, in this case, owing to the inclusion of fictional descriptions of crimes involving sex and violence, the victims of which are children)—then the government official enters the business of policing thought and all manner of non-distributed communications from which no identifiable harm has flowed." (Doc. 72 at 30). The result of this vagueness, Defendant asserts, is that "[f]ederal criminal obscenity liability could attach to any range of written expressions found anywhere on the internet, or spoken in the course of telephone conversations, in any email, or in any internet 'chat' conversation throughout the country." (*Id.*). Concludes Defendant, "[i]t would be impossible to have any measure of confidence precisely as to what sort of discussions can subject one to punishment for 'transportation of obscene matters.'" (*Id.*).

After citing Supreme Court opinions describing constitutional vagueness doctrine, the Government's Response quotes the relevant sections of 18 U.S.C. § 1462 and argues that "[t]he statute clearly delineates the proscribed conduct as knowingly using an interactive computer service to carry obscenity in interstate commerce." (Doc. 75 at 17). The Government asserts three flaws in Defendant's argument. First, that "the statute does qualify the term 'obscene' with the terms 'book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character'" which "demonstrates a congressional intent to legislate comprehensively against the distribution of obscene materials." (Doc. 75 at 17 to 18). Second, "no particular *type* of obscene

communication (written stories, emails, chats) gives rise to liability under the statute; rather it is the act of the transporting of obscene material in interstate or foreign commerce that subjects one to criminal prosecution." (Doc. 75 at 18 (emphasis the Government's)). Third, "[b]ecause the *Miller* test is incorporated into federal statutes that require an obscenity finding, there is no serious argument that the term 'obscenity' as used in the statute is indefinite." (*Id.*). The Government also quotes *Kaplan v. California* for the Supreme Court's express statement that "[o]bscenity can, of course, manifest itself in conduct, in the pictoral representation of conduct, or in the written and oral description of conduct." (Doc. 75 at 19 (quoting *Kaplan v. California*, 413 U.S. 115, 118–19, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973))). Finally, the Government asserts that the Supreme Court has rejected any argument that a statute should be rendered unconstitutionally vague because it creates a universe of "close cases." (Doc. 75 at 19 to 20 (quoting *United States v. Williams*, 553 U.S. 285, 305–06, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008))). The Government concludes that "the statute is not infirm for vagueness and no set of credible facts support the assertion that a person of ordinary intelligence could not comprehend the proscribed conduct." (Doc. 75 at 20).

Defendant's Reply states that "the nature of [Defendant's] as-applied vagueness claim ... is generally the same as the two-faceted 'fair warning' claim discussed above." (Doc. 78 at 5). Defendant argues that "[i]f the application of Section 1462 to *this conduct* is to be sustained, that would represent a monumental departure from traditional understandings of federal criminal power regarding obscenity prosecutions.... Thus, in the telecommunications age *any theory* that would expand federal criminal 'obscene-matters' transportation liability *this far* beyond its traditional

boundaries necessarily renders the statute unconstitutionally vague." (Doc. 78 at 6 (emphasis Defendant's)). Defendant describes his conduct as "an author's fictional thoughts, committed to paper and stored somewhere, the location of which is solicited by a government agent across the country, and by answering the agent's solicitation and informing him of the location of those fictional thoughts committed to paper, once the agent retrieves those papers, and transports them to his base of operations—the author has committed a serious federal crime in 'aiding and abetting' the 'interstate transportation of obscene matters.'" (Doc. 78 at 6 n. 4).

### 2. Court's Analysis and Conclusion

 The doctrine of constitutional vagueness "is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment" and states that "[a] conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)). In the context of the First Amendment, the requirement has been "relaxed" by the Supreme Court, "permitting [criminal defendants] to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Id.* (citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95 and nn. 6 & 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). But, the Supreme Court instructs, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

 Defendant appears correct in stating that his vagueness argument "is generally the same" as his fair warning argument. (Doc. 78 at 5). Thus, for the reasons stated above by the Court in rejecting Defendant's fair warning argument, Defendant's vagueness argument is similarly rejected. Furthermore, the Supreme Court's assertion in *Kaplan* that "[a]s with pictures, films, paintings, drawings, and engravings, both oral utterance and the printed word have First Amendment protection *until they collide with the long-settled position of this Court that obscenity is not protected by the Constitution,*" *Kaplan*, 413 U.S. at 119–20, 93 S.Ct. 2680 (emphasis added), serves to obviate Defendant's argument that the current prosecution is a "monumental departure" from federal obscenity regulation. (Doc. 78 at 6). To be deemed not obscene in the legal sense, matter must withstand the scrutiny of the *Miller* test. Thus, if speech does not "depict or describe patently offensive 'hard core' sexual conduct," if it does not "appeal to the prurient interest in sex," or if it "taken as a whole" possesses "serious literary, artistic, political, or scientific value," then it cannot be prosecuted under the federal obscenity statutes. *See Miller*, 413 U.S. at 24–27, 93 S.Ct. 2607. Defendant fails to identify "a substantial amount of protected speech" that would be impermissibly regulated under the rigorous obscenity standard contained in 18 U.S.C. § 1462. *Williams*, 553 U.S. at 304, 128 S.Ct. 1830; *see Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 581 n. 11, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) ("[T]he *Miller* test defines regulated speech for purposes of federal obscenity statutes."). Rather, "the type of conduct covered by the statute can be ascertained with sufficient ease to avoid due process pitfalls." *Smith v. United States*, 431 U.S. 291, 309, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) (concerning 18 U.S.C.

§ 1461). Therefore, 18 U.S.C. § 1462 is not void for unconstitutional vagueness.

### D. 18 U.S.C. § 1462's Constitutional Overbreadth

#### 1. Parties' Arguments

Defendant's Motion argues that "if § 1462 was construed to encompass a prohibition of [Defendant's] charged conduct . . ., it would also be rendered unconstitutionally broad in that it would seem to authorize the punishment of a great range of patently protected speech and conduct." (Doc. 72 at 2). Defendant argues that "the narrators and authors of a wide range of description and depiction (films, plays, novels, personal online diaries, etc.) would be subject to punishment for their expressions in genres ranging from horror to comedy, anytime a minor is described (or depicted) as the victim of a violent act, or as a participant in a sexual act." (Doc. 72 at 30 to 31). Citing *Ashcroft v. Free Speech Coalition*, Defendant asserts that the Government's urged construction of 18 U.S.C. § 1462 "would necessarily include an immense segment of our popular culture" and "would necessarily subject the authors, sellers, and transporters of work such as those . . . to potential prosecutions under this statute—depending entirely on the whim of the government's agents and attorneys, and the sensibilities of the judges and juries sitting in judgment." (Doc. 72 at 31). Defendant concludes that "[t]his almost unlimited discretion vested in the Executive is precisely what would render the statute impermissibly broad, in the general sense of constitutional overbreadth analysis." (*Id.*).

The Government's Response argues that "Section 1462 does not proscribe a substantial amount of protected speech because it proscribes obscene speech only and . . . obscenity is not protected speech under the First Amendment." (Doc. 75 at 20). The Government also asserts that Defendant's argument that his stories only reached willing participants is "factually flawed" because at least one person had alerted federal authorities to Defendant's work product after she had "stumbled upon one of Defendant's stories on a website when making an innocent inquiry into the possible illness of her daughter." (Doc. 75 at 22 to 23).

Defendant's Reply contends that the tipster's wandering upon his stories "is irrelevant to a constitutional over-breadth analysis" and is further inapposite because the tipster was Canadian. (Doc. 78 at 7 n. 6). Defendant also argues that "if [Defendant's] conduct is to be covered by the statute, then [§ ] 1462 would also be rendered impermissibly broad as it would purport to sanction the punishment of a broad range of patently protected speech and conduct." (Doc. 78 at 7).

#### 2. Court's Analysis and Conclusion

 The constitutional overbreadth doctrine "prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). The overbreadth doctrine "is predicated on the sensitive nature of protected expression: 'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.' " *New York v. Ferber*, 458 U.S. 747, 768, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (quoting *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)). "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment,"

the Supreme Court has "recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.'" *New York v. Ferber*, 458 U.S. 747, 769, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). As a consequence, the Supreme Court has "insisted that the overbreadth involved be 'substantial' before the statute involved will be invalidated on its face." *Id.*

Defendant has failed to demonstrate that 18 U.S.C. § 1462 suffers from substantial overbreadth. The statute criminalizes the interstate transportation of obscene material. 18 U.S.C. § 1462. Obscenity is not afforded First Amendment protection, and the standard for obscenity is rigorous. *See, e.g., Miller*, 413 U.S. at 24, 93 S.Ct. 2607 to 27. Because 18 U.S.C. § 1462 criminalizes only unprotected, obscene speech, it does not reasonably appear to this Court that the statute affects protected speech in any respect, let alone substantially. Therefore, 18 U.S.C. § 1462 is not void for unconstitutional overbreadth.

### E. 18 U.S.C. § 1462's Chilling Effect on Protected Speech

#### 1. Parties' Arguments

Defendant's Motion argues that "if § 1462 was construed to encompass a prohibition of [Defendant's] charged conduct ..., such a construction would also cause a 'chilling' effect on a wide range of protected expression." (Doc. 72 at 2). Defendant argues that "if the government's construction of this statute is to be accepted, and it becomes clear that a writer of fictional stories (not distributed to the unwilling public, creating no nuisance) is to be subject to criminal liability, simply because his imagination has led him to visit violence upon a child character in his fiction, or to involve the child character in sexual cir-

cumstances, then a substantial amount of protected speech will be impermissibly 'chilled' as a direct consequence." (Doc. 72 at 31).

The Government's Response describes as "unavailing" Defendant's "parade of horribles"—Defendant's list of popular works that would allegedly be chilled by the Government's theory of prosecution. (Doc. 75 at 23). The Government quotes *United States v. Williams* for the Supreme Court's proposition that the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge .... [where] the vast majority of its applications, ... raises no constitutional problems whatever." (*Id.* (quoting *United States v. Williams*, 553 U.S. 285, 303, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008)) (alterations in original)).

Defendant's Reply argues that "if [Defendant's] conduct is to be covered by the prohibition, and the statute becomes as broad and vague as the government would urge—consequentially, a substantial universe of protected activity and expression of thought would be chilled." (Doc. 78 at 7 to 8). This "universe" Defendant describes includes (i) "[d]iscussion of controversial topics across the electronic media ... (e.g., discussing cases such as this in explicit detail and with full candor over the telephone)"; (ii) "artistic creations with controversial elements"; (iii) "the ever-increasing graphic nature of the scenes depicting fictional murders, mutilations and the torture of adults and children alike in our horror films"; and (iv) "booksellers would have to seriously re-evaluate their collections." (Doc. 78 at 8). Defendant warns that "there would have to follow a great purge, a purging of the inventories of sellers and transporters of a vast range of classical as well as popular literature, films, music, and other recreational and

academic materials; not to mention, the purging of the topics of daily inter-personal discussions, and the level of candor with which they are conducted, by private citizens across the internet, telephone, or other electronic media." (*Id.*).

## 2. Court's Analysis and Conclusion

■ The Court finds Defendant's fears to be far-fetched, and his argument to lack foundation in the law. First, Defendant's examples pertaining to expressions of mere violence without any sexual content does not meet the legal standard for obscenity and thus will be ignored by the Court. *See Miller*, 413 U.S. at 27, 93 S.Ct. 2607 ("[N]o one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct."). Next, Defendant's hypotheticals dealing with sexual conduct all share a common trait: the obscene content is but a portion of the speech as a whole. In *Ashcroft v. Free Speech Coalition*, the Supreme Court stated that:

> The artistic merit of a work does not depend on the presence of a single explicit scene.... Under *Miller*, the First Amendment requires that redeeming value be judged by considering the work as a whole. Where the scene is part of the narrative, the work itself does not for this reason become obscene, even though the scene in isolation might be offensive.

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 248, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (citation omitted). Defendant's hypotheticals ignore this principle. Finally, Defendant's argument ignores the Supreme Court's holding in *Kaplan v. California* that a non-illustrated fictional book, described as containing obscenity from cover to cover, was not protected by the First Amendment. *See Kaplan v. California*, 413 U.S. 115, 116–18, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). The *Kaplan* Court

expressed no fear that its decision would chill protected speech. *See id.* at 116–22, 93 S.Ct. 2680. Likewise, this Court does not find that 18 U.S.C. § 1462 poses a "chilling effect" on protected speech.

## F. 18 U.S.C. § 1462's Application to Fictional Ideas Not Distributed to Unwilling Recipients

### 1. Parties' Arguments

Defendant's Motion argues that "the current state of 'protected speech' jurisprudence precludes this prosecution" because "fictional ideas that are not distributed to unwilling recipients are protected speech." (Doc. 72 at 2, 33). Defendant argues that "*Ashcroft [v. Free Speech Coalition]* struck down a law that banned computer generated (fictional) child pornographic images, maintaining that since no harm flowed from the production or possession of the images, they are not within the power of Congress to prohibit, and instead are 'protected speech'.... Therefore, *a fortiori*, the stories at bar are also protected speech." (Doc. 72 at 31 to 32). Defendant asserts that *New York v. Ferber* "also strongly indicates that fiction is beyond the reach of the federal obscenity statute." (Doc. 72 at 32). Defendant argues that "[s]urely, the Supreme Court would not have suggested simulated and fictional depiction of underage sex as 'an alternative' to violation of a state statute if it would subject the author of the depiction (or worse yet, a mere description) to a federal obscenity prosecution." (*Id.*). Defendant concludes that "fiction of this sort [charged in the Indictment] has already been sanctioned by the Supreme Court, on at least two occasions—and that these exact stories, under these exact circumstances, have already been held to constitute protected speech under the same rational [sic] expressed in *Ferber* and *Ashcroft.*" (*Id.*).

The Government's Response describes Defendant's argument as "incredibly misguided." (Doc. 75 at 24). After observing that "*Ferber* and *Free Speech Coalition* involved child pornography, address issues regarding federal regulation of images depicting 'real' and 'virtual' children, and stand for the proposition that images of real children being sexually abused are *per se* contraband, entirely without First Amendment protection, and do not have to be obscene to be proscribed by federal law," (*id.*), the Government states that the cases "do not undermine federal obscenity statutes that criminalize interstate transportation of obscene material." (Doc. 75 at 25). The Government asserts that "the holding in *Ferber* and the dicta in *Free Speech Coalition* stand for a proposition contrary to Defendant's argument as these cases make clear that materials that sexually exploit 'virtual' or 'fictional' children, though not amenable to regulation as child pornography, may still be regulated by obscenity laws and proscribed if deemed obscene." (Doc. 75 at 25 to 26).

Defendant's Reply states that Defendant "has yet to present any argument to the effect that Section 1462 was struck down by the Court in either *Ferber* or *Ashcroft.*" (Doc. 78 at 8). After observing that Judges Noel and Montgomery in the United States District Court for the District of Minnesota had stated that the Government "seeks to avoid the holding of *Ashcroft*" in its theory, and that the Supreme Court had "suggested simulated and fictional depiction of underage sex as 'an alternative' to violation of a state criminal statute (prohibiting depiction of actual children)," Defendant argues that "fiction of this sort [written by Defendant] has already been sanctioned by the Supreme Court, on at least two occasions—and, in fact, these exact stories, under these exact circumstances, have already been held to constitute protected speech under the reasoning

expressed in *Ferber* and *Ashcroft."* (Doc. 78 at 8 to 9).

**2. Court's Analysis and Conclusion**

 Defendant's interpretation of the law is erroneous. Without belaboring the legal analysis already performed in the sections above, the Court offers the following summary. While the states may have a legitimate interest in preventing the dissemination of obscenity to unwilling participants, *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), many other legitimate state interests exist for obscenity regulation, *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), including controlling speech that is "utterly without redeeming social importance." *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). So long as the obscenity regulation does not reach into the mere possession of obscenity in the home, *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), states may broadly regulate obscenity in all forms—including written works of non-illustrated fiction provided to a willingly purchasing customer. *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). In *Ashcroft v. Free Speech Coalition,* the Supreme Court invalidated a federal statute criminalizing any depiction of child sex even if no children were involved in the image's production because the statute did not qualify for *New York v. Ferber's* child-protection public policy exception from the First Amendment and because the statute was not tailored to *Miller v. California's* obscenity standard. *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). Nowhere in *Ashcroft* did the Supreme Court state that fiction was exempt from obscenity prosecution, and in fact the Supreme Court therein observed "that the apparent age of persons engaged in sexual conduct is relevant

to whether a depiction offends community standards [under *Miller*]." *Ashcroft*, 535 U.S. at 240, 122 S.Ct. 1389. Any suggestion by the Supreme Court in *Ashcroft*, based upon previous suggestions made in *Ferber*, that "virtual" child pornography is permissible was made in relation to "actual" child pornography involving harm to real children in its production. *See id.* at 251, 122 S.Ct. 1389. *Ferber* provided such approbation only "if it were necessary for literary or artistic value"—a clear nod by the Supreme Court that a depiction of virtual child sex avoids obscenity prosecution only if it survives the third prong of *Miller* scrutiny—because the Supreme Court "consider[ed] it unlikely that visual depictions of children performing sexual acts or lewdly exhibiting their genitals would often constitute an important and necessary part of a literary performance or scientific or educational work." *Ferber*, 458 U.S. 747, 762–63, 102 S.Ct. 3348 (1982). Contrary, therefore, to Defendant's assertions, neither *Ferber* nor *Ashcroft* support Defendant's position. While those decisions may have excluded virtual child pornography from the reach of the child pornography statutes, the Supreme Court did not grant such material safe harbor from obscenity prosecution.

For the foregoing reasons, Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72) is **DENIED.**

## VIII. GOVERNMENT'S MOTION FOR ENLARGEMENT OF PAGES (Doc. 74)

The Government's Motion for Enlargement of Pages (Doc. 74) requests an increase in the number of pages allowed under the Local Rules in order to respond to Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72). For good cause shown, the Government's Motion for Enlargement of Pages (Doc. 74) is **GRANTED.**

## IX. DEFENDANT'S MOTION TO STRIKE (Doc. 76)

Defendant's Motion to Strike (Doc. 76) requests that the Court strike the Government's Response (Doc. 75) to Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72) on grounds that the Government's Response (Doc. 75) violates the Court's Order of December 9, 2008.[30] On the same day that Defendant's Motion to Strike (Doc. 76) was filed, the Government filed a Response indicating that it had corrected all erroneously filed documents. (Doc. 77). The Court being satisfied by the Government's prompt efforts to correct the problem, Defendant's Motion to Strike (Doc. 76) is **DENIED as moot.**

## X. DEFENDANT'S MOTION FOR CONTINUANCE (Doc. 122)

Defendant's Motion for Continuance (Doc. 122) asserts that a continuance of his case would serve the interests of justice on two grounds. First, because on January 11, 2010, the Supreme Court is expected to either grant or deny a writ of certiorari on an appeal from the Fourth Circuit in *United States v. Whorley*. (Doc. 122 at 1 to 2). The defendant in *Whorley* is appealing his many convictions, including "knowingly sending or receiving 20 obscene e-mails, in violation of 18 U.S.C. § 1462." *United States v. Whorley*, 550 F.3d 326, 330 (4th Cir.2008). Second, Defendant argues that trial should not be had until his Motion to

---

**30.** The Court's December 9, 2008 Order forbade the Parties from filing "any of [Defendant's] textual stories or materials which form the basis of the indictment against Defendant, unless the same are filed under seal or by prior permission of the Court." (Doc. 66 at 2 to 3).

Dismiss the Indictment for Improper Venue (Doc. 33) is denied by an Order of this Court. (Doc. 122 at 3).

Regarding the *Whorley* defendant's petition for a writ of certiorari, this Court refuses to further delay the instant case based upon rote speculation of whether the Supreme Court will or will not hear *Whorley*. While the *Whorley* defendant's challenge to his conviction for sending obscene text emails may be similar to Defendant's instant challenge, the Supreme Court may not even choose to consider that particular portion of the *Whorley* defendant's appeal. After the great expenditure of Defendant's, the Government's, and the Court's resources in preparing for a January 2010 trial, it would not be in the interests of justice to commit further delay in the hopes that the Supreme Court addresses relevant questions raised in *Whorley*.

Regarding Defendant's second grounds for a continuance, the Court refers Defendant to Part II, *supra*, of this Order's Discussion section, in which the Court denies Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33).

For the foregoing reasons, Defendant's Motion for Continuance (Doc. 122) is **DENIED.**

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Extension of Time (Doc. 36) is **DENIED as moot;** Defendant's Motion to Dismiss the Indictment for Improper Venue (Doc. 33) is **DENIED** and the Court will not grant leave for an interlocutory appeal of the issue; Defendant's Motion to Dismiss the Indictment on Multiple Grounds of Preclusion and Estoppel (Doc. 34) is **DENIED;** Defendant's Motion to Unseal Transcripts of Grand Jury Proceedings (Doc. 41) is **DENIED;** Defendant's Motion to Dismiss Indictment on Grounds of Government Misconduct Before the Grand Jury (Doc. 50) is **DENIED;** Defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 70) is **DENIED as moot;** Defendant's Amended Motion to Dismiss the Indictment for Failure to State an Offense (Doc. 72) is **DENIED;** Government's Motion for Enlargement of Pages (Doc. 74) is **GRANTED;** Defendant's Motion to Strike (Doc. 76) is **DENIED as moot;** and Defendant's Motion for Continuance (Doc. 122) is **DENIED.**